# 16-3303-cv(L),

## 16-3304-cv(Con)

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

---

PETERSEN ENERGÍA INVERSORA, S.A.U. and
PETERSEN ENERGÍA, S.A.U.,

*Plaintiffs-Appellees,*

v.

ARGENTINE REPUBLIC and YPF S.A.,

*Defendants-Appellants.*

---

On Appeals from the United States District Court
for the Southern District of New York

---

### BRIEF OF PLAINTIFFS-APPELLEES

---

REGINALD R. SMITH
KING & SPALDING
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
(713) 751-3200
(713) 751-3290 (fax)



March 14, 2017

MICHAEL K. KELLOGG
MARK C. HANSEN
DEREK T. HO
BENJAMIN S. SOFTNESS
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

*Counsel for Plaintiffs-Appellees*

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1 Plaintiffs-Appellees Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. state the following:

Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. are non-governmental corporate entities.

Petersen Energía Inversora, S.A.U. is a Spanish corporation wholly owned by Petersen Energía Inversora Holdings, S.A.U., a Spanish corporation that in turn is wholly owned by Petersen Energía Inversora, S.A., a privately held Argentine corporation.

Petersen Energía, S.A.U. is a Spanish corporation wholly owned by Petersen Inversiones Spain, S.A.U., a Spanish corporation that in turn is wholly owned by Petersen Energía Inversora, S.A., a privately held Argentine corporation.

No public corporation owns 10% or more of the stock of either Plaintiff-Appellee.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENTS ......................................................i

TABLE OF AUTHORITIES ...............................................................iv

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ............................................................8

ISSUES PRESENTED....................................................................8

STATEMENT ..........................................................................9

SUMMARY OF ARGUMENT ...............................................................25

STANDARD OF REVIEW ................................................................29

ARGUMENT ..........................................................................30

    I.    THE FEDERAL COURTS HAVE JURISDICTION OVER
        THIS SUIT UNDER THE FSIA'S "COMMERCIAL
        ACTIVITIES" EXCEPTION ..........................................................30

        A.    The District Court Correctly Held That the Gravamen
            of Plaintiffs' Complaint Is Defendants' Commercial
            Activity in Breaching the Bylaws' Tender-Offer
            Obligation................................................................30

        B.    Defendants' Course of Commercial Conduct in
            Enacting the Amended Bylaws Further Supports
            the Applicability of the Commercial-Activities
            Exception ................................................................36

        C.    The District Court Correctly Rejected Defendants'
            Effort To Recharacterize Petersen's Claim as a
            Challenge to Argentina's Expropriation of Repsol's
            Shares ...................................................................39

            1.    Plaintiffs' Claim Challenges the Contractual
                Failure To Tender for Petersen's Shares, Not
                the Expropriation of Repsol's Shares ...............................39

ii

        2.      Argentina's Efforts To Distort Plaintiffs'
              Claim Into a Challenge to the Expropriation
              Misread the Bylaws ........................................................40

        3.      The District Court Correctly Concluded That
              the Expropriation Law Did Not Impliedly
              Preempt the Tender-Offer Requirement ........................50

    D.     YPF's Separate FSIA Argument Is Meritless..........................55

II.     THE U.S. NEXUS REQUIREMENT OF THE
       COMMERCIAL-ACTIVITIES EXCEPTION IS
       SATISFIED .........................................................................60

    A.     Defendants' Commercial Conduct Caused Direct
          Effects in the United States......................................60

    B.     Defendants' Conduct Also Had Substantial Contact
          with the United States ..............................................62

III.    THE ACT OF STATE DOCTRINE IS NOT PROPERLY
       BEFORE THE COURT AND, IN ANY EVENT, DOES
       NOT APPLY HERE.............................................................65

    A.     The Act of State Defense Is Inapplicable Because
          Plaintiffs Do Not Challenge the Legality of the
          Expropriation Law ..................................................65

    B.     Argentina's Acts Were Not Carried out Solely in
          Argentina.................................................................70

CONCLUSION ........................................................................71

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## CASES

*Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*,
305 F.3d 82 (2d Cir. 2002) .......................................................................62

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25
(2d Cir. 1996)...........................................................................................36

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682
(1976)......................................................................................................24

*Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516
(2d Cir. 1985)...........................................................................................71

*American Constr. Mach. & Equip. Corp. v. Mechanised Constr.
of Pakistan Ltd.*, No. 85 Civ. 3765 (JFK), 1986 WL 2973
(S.D.N.Y. Mar. 5, 1986) ...................................................................... 63-64

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428
(1989)......................................................................................................30

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*:

2 F. Supp. 3d 550 (S.D.N.Y. 2014), *aff'd*, 813 F.3d 98 (2d Cir.),
*cert. denied*, 137 S. Ct. 493 (2016)............................................... 62-63

813 F.3d 98 (2d Cir.), *cert. denied*, 137 S. Ct. 493 (2016) ..........8, 20, 21, 22,
30, 31, 60, 61

*Bandes v. Harlow & Jones, Inc.*, 852 F.2d 661 (2d Cir. 1988) ..............................71

*Bernard v. Las Americas Commc'ns, Inc.*, 84 F.3d 103 (2d Cir. 1996).................47

*Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2000)............................................29

*Braka v. Bancomer, S.N.C.*, 762 F.2d 222 (2d Cir. 1985)....................................24

*Curley v. AMR Corp.*, 153 F.3d 5 (2d Cir. 1998) .................................................53

*D'Angelo v. Petroleos Mexicanos*, 422 F. Supp. 1280 (D. Del. 1976),
*aff'd*, 564 F.2d 89 (3d Cir. 1977) ...................................................................54

*Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736
(S.D.N.Y. 2004), *clarified on denial of recon.*, No. 02 Civ.
6356(SHS), 2005 WL 2585227 (S.D.N.Y. Oct. 13, 2005) ..............37, 63, 66

*de Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013).........3, 20, 32, 38

*Delgado v. Shell Oil Co.*, 890 F. Supp. 1324 (S.D. Tex. 1995), *aff'd*,
231 F.3d 165 (5th Cir. 2000) ........................................................54

*Domnister v. Exclusive Ambulette, Inc.*, 607 F.3d 84 (2d Cir. 2010).....................39

*EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621
(2d Cir. 2007)..........................................................................56

*EM Ltd. v. Republic of Argentina*, 389 F. App'x 38 (2d Cir. 2010).......................37

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438
(D.C. Cir. 1990) .......................................................................38

*Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) .....................................33

*Gemini Shipping, Inc. v. Foreign Trade Org. for Chems. &
Foodstuffs*, 647 F.2d 317 (2d Cir. 1981) .......................................62

*Gibbons v. Udaras na Gaeltachta*, 549 F. Supp. 1094 (S.D.N.Y. 1982)..........63, 64

*Grand Jury Subpoena dated August 9, 2000, In re*, 218 F. Supp. 2d 544
(S.D.N.Y. 2002).......................................................................71

*Guevara v. Republic of Peru*, 468 F.3d 1289 (11th Cir. 2006) .......................20, 32,
33, 34, 35, 49

*Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69 (2d Cir. 2010).......................65

*Hanil Bank v. PT. Bank Negara Indonesia*, 148 F.3d 127 (2d Cir. 1998) .............31

*Janini v. Kuwait Univ.*, 43 F.3d 1534 (D.C. Cir. 1995)...............................33, 55, 59

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) .......................................................29

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave
Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21
(2d Cir. 1990).........................................................................29

*Konowaloff v. Metropolitan Museum of Art*, 702 F.3d 140 (2d Cir. 2012).......23, 66

*Lightwater Corp. v. Republic of Argentina*, Nos. 02 Civ. 3804 (TPG)
    et al., 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003) .....................................71

*M+J Savitt, Inc. v Savitt*, No. 08 Civ. 8535 (DLC), 2009 WL 691278
    (S.D.N.Y. Mar. 17, 2009) ..............................................................................32

*McElderry v. Cathay Pac. Airways, Ltd.*, 678 F. Supp. 1071
    (S.D.N.Y. 1988)...............................................................................................70

*NML Capital, Ltd. v. Republic of Argentina*:

    680 F.3d 254 (2d Cir. 2012) ...........................................................................38

    699 F.3d 246 (2d Cir. 2012) ...........................................................................52

    727 F.3d 230 (2d Cir. 2013) ...........................................................................52

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*,
    830 F.2d 449 (2d Cir. 1987) .....................................................................69, 70

*OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015) ..............................31, 39

*Oliveira v. Quartet Merger Corp.*, 662 F. App'x 47 (2d Cir. 2016) ......................32

*Prudential Lines, Inc., In re*, 59 F.3d 327 (2d Cir. 1995)......................................29

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992).........................30, 31,
    37, 55, 59, 60

*Republic of Austria v. Altmann*, 541 U.S. 677 (2004) ...........................................66

*RLS Assocs., LLC v. United Bank of Kuwait PLC*, 380 F.3d 704
    (2d Cir. 2004)..................................................................................................47

*Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001).....................29

*Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131 (2d Cir. 2012).........................65

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ......................................21, 38, 39, 56

*Shapiro v. Republic of Bolivia*, 930 F.2d 1013 (2d Cir. 1991).........................37, 64

*Shen v. Japan Airlines*, 918 F. Supp. 686 (S.D.N.Y.), *aff'd*,
43 F.3d 1459 (2d Cir. 1994) .........................................................70

*Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*, No. 12 Civ.
7316 (LGS), 2014 WL 288705 (S.D.N.Y. Jan. 27, 2014).....................34, 35

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) .......................49, 59

*Vitamin C Antitrust Litigation, In re*:

    810 F. Supp. 2d 522 (E.D.N.Y. 2011).........................................70

    837 F.3d 175 (2d Cir. 2016) ...............................................53, 54

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*,
493 U.S. 400 (1990).........................................................66, 69, 70

*WMW Mach., Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*,
960 F. Supp. 734 (S.D.N.Y. 1997) ...............................................37

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154
(D.C. Cir. 2002) ...................................................................68

## STATUTES, REGULATIONS, AND RULES

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330,
1602 *et seq.* ....................................................................*passim*

    28 U.S.C. § 1330(a) .....................................................30

    28 U.S.C. § 1330(b) .....................................................30

    28 U.S.C. § 1603.........................................................64

    28 U.S.C. § 1603(b)(2) ..................................................55

    28 U.S.C. § 1603(d).........................31, 38, 48, 55, 59, 62

    28 U.S.C. § 1603(e) ...........................................27, 62, 65

    28 U.S.C. § 1604.........................................................30

    28 U.S.C. § 1605(a)(2)....................20, 23, 25, 27, 30, 31, 60, 62, 65

vii

28 U.S.C. § 1292(b) ..............................................................8, 24, 28, 29, 65

17 C.F.R.:

    § 229.1016(a)(1) ...........................................................................12

    § 240.13d-101 ...............................................................................12

    § 240.14d-100 ...............................................................................12

Fed. R. Civ. P. 12(b)(6)..................................................................56, 66

NYSE R. 311.03..............................................................................11


## OTHER MATERIALS

Compl., *Eton Park Capital Mgmt., L.P. v. Argentine Republic*,
    No. 1:16-cv-8569 (S.D.N.Y. filed Nov. 3, 2016).....................2, 14

3 Dan. B. Dobbs, *Law of Remedies* (2d ed. 1993)................................48

Petersen Energía Inversora, S.A., Ex. 99.A.1 to Tender Offer Statement
    (Sept. 11, 2008), *available at* https://www.sec.gov/Archives/edgar/
    data/904851/000095012308010918/y71140exv99waw1waw1.htm .............61

Restatement (Second) of Contracts (1981)...........................................47

Stipulation of Voluntary Dismissal with Prejudice, *Repsol YPF, S.A. v.
    Republic of Argentina*, No. 12 Civ. 3877 (TPG) (FM) (S.D.N.Y.
    filed May 9, 2014); https://imagenes.repsol.com/es_en/
    STRUCTURE_AND_BASIC_ELEMENTS_OF_THE_
    AGREEMENT_FOR_THE_AMICABLE_SETTLEMENT_
    AND_COMPROMISE_OF_EXPROPRIATION_tcm11-
    673749.pdf ..................................................................................7

24 *Williston on Contracts* (4th ed. 2002)...........................................48

YPF Sociedad Anónima:

    Bylaws, https://www.sec.gov/Archives/edgar/data/904851/
    000119312506147059/dex12.htm.................................................................... 43

    Form 20-F (SEC filed Mar. 30, 2015), *available at* https://www.
    sec.gov/Archives/edgar/data/904851/000119312515111986/
    d863353d20f.htm............................................................................................17

## INTRODUCTION

Prior to 1993, Argentina maintained YPF S.A. ("YPF" or the "Company") as a state-owned oil company. In 1993, Argentina decided to convert YPF into a private for-profit corporation through a public offering of YPF's shares on the New York Stock Exchange ("NYSE"). Argentina and YPF recognized that potential investors were wary, and concerned that the government might reacquire control of YPF and destroy the value of YPF's public shares. To overcome those concerns, and to induce private investors to buy the shares, Argentina and YPF committed to explicit contractual protection for investors: they amended the Company's bylaws – a contract between the company and its shareholders – to provide that, if the Argentine government ever reacquired a controlling interest in the Company, Argentina and YPF would comply with bylaw provisions requiring a tender offer for the shares of any remaining shareholders at a price set by formula in the bylaws. For purposes of this contractual protection, it made no difference *how* Argentina acquired its controlling interest. Assured by these contractual commitments, investors bought billions of dollars in YPF shares.

Argentina retook control of YPF in the spring of 2012. Argentina did *not* expropriate the entire Company, which would have triggered an obligation under Argentine law to pay for all of the shares. *See* A500 (Declaration of Alberto B. Bianchi ("Bianchi Decl.") ¶¶ 15-20). Argentina chose instead to expropriate only

51% of YPF's outstanding shares from YPF's then-majority shareholder, Repsol S.A., and thereby to minimize its obligation to pay for the expropriation. Argentina and YPF made the limited nature of the governmental action clear: they announced that Argentina had simply become the majority shareholder in YPF and that in all other respects the enterprise remained a for-profit, private company with all of its governance provisions and shareholder protections still in effect.

But after reacquiring a controlling stake in YPF, and stepping into Repsol's shoes as controlling shareholder, Argentina announced that it and YPF would not honor their contractual obligation to Petersen and other YPF shareholders who held their shares in New York. As a result, the value of the stranded shares dropped precipitously, and Plaintiffs were effectively wiped out.[1]

In a thorough and well-reasoned opinion, the district court (Preska, J.) correctly held that Petersen's claims could proceed against both defendants under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), finding that the conduct at issue is classic commercial conduct, not sovereign acts. When the majority shareholder (Argentina) and the Company (YPF) chose not to honor their commercial commitments in the YPF bylaws, they breached an express contractual

---

[1] Other U.S.-based investors, including the New York-based multi-billion-dollar investment manager Eton Park Capital Management, L.P. ("Eton Park"), whose similar claims are pending in the Southern District of New York, likewise suffered similar losses. *See* Compl., *Eton Park Capital Mgmt., L.P. v. Argentine Republic*, No. 1:16-cv-8569 (S.D.N.Y. filed Nov. 3, 2016) ("*Eton Park*").

obligation (the tender-offer requirement) that both had undertaken as part of a course of commercial conduct (raising private capital on U.S. securities markets). Courts have consistently held that "a foreign state's repudiation of a contract is precisely the type of activity" for which a sovereign and its instrumentalities may properly be held to account in U.S. courts. *de Csepel v. Republic of Hungary*, 714 F.3d 591, 599 (D.C. Cir. 2013).

Argentina's and YPF's arguments on appeal rest on mischaracterizations of Petersen's claims.

*First*, in an effort to transform commercial conduct into a sovereign act, Defendants argue that Petersen challenges the expropriation of *Repsol's* shares. Specifically, they claim that the bylaws prohibit an acquirer from crossing an ownership threshold by any means *other than* a tender offer and that Petersen's breach-of-contract allegations with respect to its *own* shares must therefore somehow rest on a challenge to the expropriation, which did not involve a tender offer. But, in addition to being incoherent, that argument mischaracterizes what the bylaws say and what Petersen claims. The bylaws provide that if and when Argentina crosses an applicable ownership percentage threshold – "by any means" – it must tender for the *remaining* shares. The bylaws do not require that the acquisition that *triggers* the tender offer itself be effected through a tender offer. Indeed, prior shareholders that have acquired sufficient YPF stock to cross the

3

threshold requiring a tender offer – including Plaintiffs – have adhered to the tender-offer obligation by conducting tender offers distinct from the underlying stock acquisition.  Petersen simply is not arguing that Argentina was required to acquire *Repsol's* shares through a tender offer.

*Second*, Defendants argue that the bylaws required Argentina and YPF to complete the tender offer *before* acquiring control of the Company.  Because Argentina acquired 51% without making the required tender offer, Defendants suggest that Argentina *impliedly* expropriated Plaintiffs' contract rights along with the Repsol shares that it explicitly took.  But Argentina did no such thing, as the district court correctly held.  The Expropriation Law expressly stated that Argentina was taking a 51% stake from Repsol, but that in all other respects the rights of shareholders were undisturbed.  And nothing in the bylaws requires the precise choreography on which Defendants base their strained reading.  The bylaws state that Argentina may not take over YPF without *also* making a tender offer for the remaining shares.  The bylaws do *not* state or imply that the tender offer must precede government acquisition of control.  The timing of the required tender offer – in relation to the acquisition of control "by any means" – simply makes no difference to Defendants' commercial obligation contained in the bylaws. Defendants' contrary arguments ignore the controlling Expropriation Law and YPF bylaws and instead rest on out-of-context quotations from the complaint and from

Plaintiffs' experts. They also defy commercial reality: when Argentina and YPF raised billions of dollars in the initial public offering ("IPO"), they calmed investor fears of this very kind of government takeover by guaranteeing that shareholders would have a compensated exit. Had Argentina spelled out then the kind of semantic arguments it is raising now in an effort to avoid that obligation, there would have been no IPO.

*Third*, Defendants suggest that the tender-offer requirement conflicts with the Expropriation Law because that law required Argentina to acquire exactly 51% of the Company – and *prevented* it from acquiring any larger share through separate transactions. That position is contrary to the Expropriation Law itself. As the district court again correctly held, the Expropriation Law nowhere prohibits Argentina from acquiring additional shares through a tender offer (or any other means). Moreover, far from superseding the bylaws, the Expropriation Law explicitly and repeatedly reaffirms that YPF will continue to operate as a private company, pursuant to existing corporate governance rules, including the bylaws. And, in any event, even if the Expropriation Law had directed Argentina to breach the tender-offer obligation in the bylaws (which it did not), that would not change the commercial nature of the parties' contract, which is the gravamen of Plaintiffs' complaint.

YPF's sole independent argument for dismissal likewise mischaracterizes Petersen's claims against it. Petersen's YPF claims do not depend on a showing

that YPF could or should have stopped Argentina's acquisition of a controlling stake in the Company. Rather, as the district court correctly held (in a ruling not at issue in these appeals), the bylaws are plausibly understood to make YPF a guarantor of Argentina's obligation to tender. As a party to the bylaws, YPF is equally liable for the failure to tender, even if that breach is attributable to the direction of its controlling shareholder, Argentina. Petersen's claims against YPF thus implicate the same course of commercial conduct as its claims against Argentina, and they fall within the commercial-activities exception for the same reasons. It would be odd indeed to hold that a commercial enterprise can invoke sovereign immunity by blaming its controlling shareholder for its contract breaches when that shareholder's own activity falls squarely within the commercial-activities exception to the FSIA.

The Court has not yet decided whether to accept for immediate appeal Defendants' arguments that their disavowal of their commercial contract was an "act of state" that cannot be challenged in a U.S. court. Regardless, Defendants' challenges to the sound decision of the district court rejecting that argument are, like their FSIA arguments, without merit. Petersen's suit does not challenge the legality of Argentina's expropriation or any other sovereign activity. It challenges only Defendants' purely commercial activities – specifically, their breach of the contractual obligation to tender for Petersen's shares.

6

All of Defendants' arguments boil down to the same misconception: that Petersen is challenging the expropriation of Repsol's shares. But Petersen does not challenge that expropriation or any aspect of the laws and government decrees that authorized it; that issue is between Argentina and Repsol (and is something Argentina settled publicly for five billion dollars).[2] Petersen merely seeks damages for the breach of the contractual obligation *triggered* by that expropriation – an expropriation Petersen's complaint presumes to be valid. Whatever the reason for Defendants' breach, a breach of a company's bylaws falls squarely within the FSIA's commercial-activities exception.

---

[2] *See* Stipulation of Voluntary Dismissal with Prejudice, *Repsol YPF, S.A. v. Republic of Argentina*, No. 12 Civ. 3877 (TPG) (FM) (S.D.N.Y. filed May 9, 2014); https://imagenes.repsol.com/es_en/STRUCTURE_AND_BASIC_ELEMENTS_ OF_THE_AGREEMENT_FOR_THE_AMICABLE_SETTLEMENT_AND_ COMPROMISE_OF_EXPROPRIATION_tcm11-673749.pdf. The fact that the settlement also resolved Repsol's claims in the district court with respect to the 6% stake Repsol continued to own – a breach-of-contract claim under the bylaws identical to Petersen's – undermines Argentina's argument that the bylaws are incompatible with the Expropriation Law (or any other sovereign law).

7

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under the collateral-order doctrine over Defendants' appeals from the district court's denial of their motions to dismiss based on the Foreign Sovereign Immunities Act of 1976. *See Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 116 (2d Cir.), *cert. denied*, 137 S. Ct. 493 (2016). Defendants have applied to this Court under 28 U.S.C. § 1292(b) for permission to appeal the district court's denial of their motions to dismiss based on the act of state doctrine. Those motions have been referred to the merits panel.

## ISSUES PRESENTED

In this lawsuit, Plaintiffs allege that Defendants the Argentine Republic and YPF (Argentina's instrumentality) breached a commercial contract that required any shareholder acquiring control of Defendant YPF to engage in a commercial tender offer in New York City pursuant to the rules of the New York Stock Exchange. The tender offer would have operated to the benefit of YPF shareholders, including many shareholders located in the United States and many whose shares were held in U.S. financial institutions. The issues presented are:

1.      Whether Plaintiffs' suit falls within the third clause of the FSIA's commercial-activities exception because it is based upon an act outside the United

8

States in connection with a commercial activity of a foreign state elsewhere that caused a direct effect in the United States;

**2.** Whether, in the alternative, Plaintiffs' suit falls within the first clause of the FSIA's commercial-activities exception because it is based upon commercial activity carried on in the United States by a foreign state;

**3.** If the Court decides to accept interlocutory review of the issue, whether this lawsuit, which does not challenge (and indeed presumes) the legality of any sovereign act, is barred by the act of state doctrine.

## STATEMENT

These are interlocutory appeals by Defendants Argentina and YPF from the district court's order denying their motions to dismiss based on the Foreign Sovereign Immunities Act of 1976 ("FSIA") and, if jurisdiction is accepted by this Court, based on the act of state doctrine. *See Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15-cv-2739 (LAP), 2016 WL 4735367 (S.D.N.Y. Sept. 9, 2016) (Preska, J.) ("Op.") (SPA1-47).

**1.** Argentina created YPF – or, as it was originally known, Yacimientos Petroliferos Fiscales ("fiscal oilfields") – in 1922 as the country's state oil producer. For more than seven decades, Argentina ran YPF not as a private enterprise for the benefit of private shareholders, but as a state enterprise designed to further "Argentine political and social objectives." A18 (Compl. ¶ 11); *see also* A469-70

(Declaration of Alfredo L. Rovira ("Rovira Decl.")) ¶¶ 10-18) (explaining that "YPF was originally created as an Argentine federal government agency" and then was later converted into a "State Company" (*sociedad del estado*), owned and operated by the government). In the early 1990s, however, Argentina decided to transform YPF into a "*sociedad anónima*" – the equivalent of a private corporation under U.S. law – and to raise capital in the international financial markets through an IPO of 140 million YPF Class D shares, comprising nearly 100% of YPF's voting stock, on major international stock exchanges, including the NYSE. *See* A14, A18-19 (Compl. ¶¶2, 12-13); *see also* A469 (Rovira Decl. ¶11).[3]

To attract international capital, Argentina realized that it had to provide two critical assurances to potential investors: (1) that YPF, formerly run with only state interests in mind, would be run for the benefit of its private shareholders; and (2) that, if Argentina should ever retake control of the Company for any reason, private investors would be given an opportunity to protect their investment by divesting from the Company at a market-based price undiminished by the economic effects of the takeover. *See* A19-20 (Compl. ¶ 15). To that end, Argentina and YPF adopted two critical amendments to YPF's bylaws.

*Section 7.* The first amendment, found at § 7 of the bylaws, requires any party that acquires control of 15% or more of YPF's capital stock to launch a

---

[3] Unless otherwise noted, the YPF shares referred to herein are Class D shares.

10

tender offer for all of the shares of all classes of YPF stock. A410 (Bylaws § 7(e)(ii) (Ex. 2 to Declaration of Martin Domb ("Domb Decl."))). The tender-offer obligation applies regardless of the manner in which the shareholder attains the threshold level of control: by its terms, the bylaws mandate a tender offer if a shareholder takes control of the requisite number of shares "whether directly or indirectly, by any means or instrument." A409 (*id.* § 7(d)). Furthermore, to protect shareholders from any change in value caused by the change of control or post-control events, § 7 prescribes that the price for the tender offer shall be computed based on objective metrics regarding the Company's performance prior to the change in control. A412 (*id.* § 7(f)(v)); *see also* A22 (Compl. ¶ 21) (describing the formula).

Because Argentina and YPF intended to raise significant capital on U.S. markets, and specifically on the NYSE, § 7 requires performance of the tender-offer obligation in the United States. In the event of a § 7 change in control, a party making a tender offer must:

- Publish notice of the offer in major New York newspapers, *see* A411-12 (Bylaws § 7(f)(iv)); A31 (Compl. ¶ 44);

- Comply with the NYSE rules governing tender offers, *see* A410 (Bylaws § 7(f)), including the obligation to deliver offering material "to the Exchange no later than the distribution date to shareholders," NYSE R. 311.03; A31 (Compl. ¶ 44);

- Comply with Securities and Exchange Commission ("SEC") regulations, *see* A410 (Bylaws § 7(f)), including the obligation to file with the agency

11

forms describing the terms of the offer and a copy of the offer materials themselves, *see* 17 C.F.R. §§ 229.1016(a)(1), 240.13d-101, 240.14d-100; *see also* A31 (Compl. ¶ 44); and

- Transmit the offer to YPF, which would then transmit the offer to record shareholders, *see* A411 (Bylaws § 7(f)(iii)), including any in the United States, *see* A24-25 (Compl. ¶¶ 27-28).

*Section 28*. As an added layer of investor protection, Argentina and YPF added a special provision to YPF's bylaws imposing a tender-offer obligation on acquisitions by Argentina itself. *See* A21-22 (Compl. ¶¶ 18-20). Entitled "Provisions applicable to acquisitions by the National Government," Section 28 states that the provisions of § 7(e) and § 7(f) "shall apply to *all acquisitions* made by the National Government," "directly or indirectly, *by any means or instrument*," "if, as a consequence of such acquisition," the government becomes the owner of at least 49% of the Company's capital stock. A432 (Bylaws § 28(A)) (emphases added). The purpose of Section 28 was to make unequivocal that any re-acquisition by Argentina of a significant stake in YPF – "by any means" – would entitle private shareholders to an opportunity to sell their shares and divest from YPF.

2.    Following the enactment of the bylaws amendments, Argentina and YPF featured the amendments in an extensive marketing campaign aimed at U.S. investors. To publicize the offering in the United States, YPF widely circulated a U.S. IPO Prospectus, which described the new bylaw protections. YPF also filed

12

the revised bylaws with the SEC and embarked on a roadshow to disseminate

marketing and financial information to potential investors across the United States.

*See* A18-19 (Compl. ¶¶ 13-14).

The marketing worked. Of the 140 million shares YPF sold in the IPO, 65

million shares – the largest single portion – were sold into the United States,

generating more than $1.1 billion in proceeds for Argentina. *See id.* Accordingly,

the majority of YPF's shares traded as American Depositary Shares ("ADSs") on

the NYSE. The ADSs were held in the form of American Depositary Receipts

("ADRs") issued by the Bank of New York Mellon out of its New York offices.

*See id*.

**3.** Between 2008 and 2011, acting in justifiable reliance on the bylaw

protections discussed above, Plaintiffs purchased approximately 25% of YPF's

shares. *See* A24-26 (Compl. ¶¶ 27-30). Plaintiffs acquired their shares in several

transactions, including a tender offer pursuant to § 7 when their ownership interest

crossed the threshold set forth in the bylaws. *See* A25 (*id.* ¶ 28). All of the shares

were held in the form of ADRs issued by the Bank of New York Mellon and

representing ADSs traded on the NYSE. *See id.*; SPA5 (Op. 5). The purchases

were financed in large part using loans from New York-based banks; Plaintiffs

pledged interests in the stock as collateral for the loans and the physical certificates

resided with Bank of New York Mellon in New York City. *See* A24-26 (Compl.

13

¶¶ 27-30).  Plaintiffs' purchases made them the second-largest holder of YPF shares following YPF's majority shareholder, Repsol S.A. ("Repsol"), which owned 57% of YPF's shares.

Other U.S. investors also purchased significant positions in YPF in reliance on the bylaws.  Between 2010 and 2012, New York-based investment fund Eton Park Capital Management, L.P. and its affiliates ("Eton Park") acquired approximately 11.95 million YPF shares for a purchase price of approximately $448 million, making it the third-largest shareholder in YPF.  Eton Park has filed a separate lawsuit against Argentina and YPF alleging substantially the same claims as Plaintiffs here.  *See* Compl. ¶ 5, *Eton Park*; Supplemental Authority Letter, *Petersen*, Dkt. #57 (S.D.N.Y. filed Feb. 10, 2016).

**4.** From the IPO through 2011, YPF was a successful private commercial enterprise, operated by professional management for the benefit of its shareholders.  Its commercial success made it a tempting target for the Argentine government, and, in early 2012, Argentina decided to retake control of YPF.  *See* A26-27 (Compl. ¶ 33).  Beginning in January 2012, Argentina leaked its takeover plans to the financial markets, in an intentional effort to depress YPF's stock price.  Those leaks jolted investor confidence in YPF and caused YPF's share price to fall by more than 45% between January 2012 and early April 2012.  *See* A27 (*id.* ¶ 34).

14

Having devalued YPF's stock price, on April 16, 2012, Argentina announced legislation to expropriate 51% of YPF's shares owned by Repsol. *See* A15 (*id.* ¶ 35). The legislation (known as the Expropriation Law) declared that 51% of YPF's shares, owned by Repsol, were subject to expropriation, and put Argentina in the shoes of Repsol as the majority shareholder of YPF, subject to all of the rights and obligations Repsol had under YPF's corporate governance provisions, including the bylaws, which remained unaltered. *See* A449 (Expropriation Law § 7 (Ex. 12 to Domb Decl.)) (the "fifty-one percent (51%) of the equity interest of [YPF], represented by an identical stake of Class D shares held by [Repsol and its affiliates], is hereby declared a public interest and subject to expropriation"); A450 (*id.* § 13) (providing that Argentina "shall exercise all of the rights conferred upon the shares subject to expropriation").

Critically, the Expropriation Law did not purport to expropriate YPF outright. It left the remainder of Repsol's stake (representing 6% of YPF's shares) and the shares of all other shareholders (including Petersen and Eton Park) unaffected. Nor did the law purport to convert YPF back to a state company (*sociedad del estado*), as it had been prior to 1977. *See supra* p. 10. Rather, the Expropriation Law explicitly preserved YPF's status as a private corporation (*sociedad anónima*). *See* A450 (Expropriation Law § 15) (stating that YPF "shall continue to operate as [a] publicly traded corporation[] pursuant to Chapter II,

Section V of [Argentine Companies] Law Nº 19,550 and its corresponding regulations, and shall not be subject to any legislation or regulation applicable to the management or control of Companies or entities owned by the National Government or provincial governments"). Further, the Expropriation Law expressly required Argentina to adhere to the principles of private corporate governance, including respect for YPF's bylaws. *See* A451 (§ 16(b)) (requiring Argentina to administer YPF "pursuant to the industry's best practices and corporate governance, safeguarding shareholder interest and generating value on their behalf").

Consistent with its private corporate governance structure, the Expropriation Law also made clear that Argentina would control YPF not as a sovereign but as a majority shareholder exercising the voting rights associated with the expropriated shares. For example, it called for the national government and provincial governments, which would share ownership of the expropriated shares,[4] to enter into a shareholders' agreement providing for the "unified" exercise of the voting rights associated with those shares. *See* A449 (*id.* § 9). The law also prescribed how the national government and the provinces, as controlling shareholders, would

---

[4] The law provided that Argentina's national government would retain 51% of the expropriated shares and transfer 49% to the Argentine provincial governments. *See* A449 (Expropriation Law § 9).

16

elect YPF's directors, pursuant to the process set out in Section 11 of the bylaws. *See id.*

At the same time it announced the Expropriation Law, on April 16, 2012, Argentina's executive branch decreed the appointment of a receiver (known as an "Intervenor") to exercise the powers of YPF's Board of Directors and President for 30 days. *See* A28 (Compl. ¶ 35); A450 (Expropriation Law § 14); A439 (Executive Decree 530/12, at 5 (Ex. 11 to Domb Decl.)). Like the Expropriation Law, Executive Decree 530/12 did not purport to abrogate or modify YPF's bylaws. Indeed, the Intervenor's powers were defined by the bylaws. *See* A440 (Executive Decree 530/12, at 6) (granting Intervenor the "powers conferred by YPF S.A. Bylaws to the Board of Directors and/or the President of the company"). Moreover, the Decree was adopted as a stopgap measure to "ensure . . . compliance" with the Expropriation Law until Argentina obtained the right to control YPF by voting the expropriated shares. *See* A450 (Expropriation Law § 14) (authorizing Intervenor to manage YPF "until control of YPF . . . is assumed"). The Intervenor's powers expired on June 4, 2012, when Argentina called a shareholders' meeting and installed new directors pursuant to the Company's bylaws. *See* YPF Sociedad Anónima, Form 20-F at 31 (SEC filed Mar. 30, 2015) (for fiscal year ending December 31, 2014), *available at* https://www.sec.gov/Archives/edgar/data/904851/000119312515111986/d863353d20f.htm.

17

5.     Despite acquiring control of Repsol's 51% of YPF's shares – an acquisition that clearly triggered Sections 7 and 28 of the bylaws – Argentina refused to make a tender offer for any shares held by the remaining shareholders of YPF, including Plaintiffs.  Argentina's Deputy Economy Minister – who had been appointed Vice-Intervenor of YPF – called Argentina's tender-offer obligation an "unfair" "bear trap" and publicly announced that Argentina would not comply with it.  A28-29 (Compl. ¶ 38).  Argentina and YPF, the Vice-Intervenor said, would not "be stupid and buy everyone according to YPF's own law, respecting its by-law."  A29 (*id.* ¶ 38 n.1).

As a result of Argentina and YPF's actions, the price of YPF's shares plummeted even further after April 2012, which severely depressed the value of the collateral securing Plaintiffs' loans and caused Plaintiffs to default.  Plaintiffs' creditors foreclosed on the shares that were held as collateral by Bank of New York Mellon in New York City.  In July 2012, Plaintiffs filed for bankruptcy protection in Spain, and a Spanish bankruptcy court subsequently declared the Petersen entities insolvent.  *See* A31-32 (*id.* ¶ 46).

6.     Plaintiffs' claims were initially included in a putative class action brought by Repsol, which alleged that Argentina failed to tender for the 6% of Repsol's YPF shares that were not expropriated.  Argentina settled that case prior to class certification in May 2014, as part of a global settlement that also resolved

18

Repsol's international arbitration seeking compensation for the 51% of shares that were expropriated. *See supra* note 2.

In May 2015, Plaintiffs, through their court-appointed bankruptcy receiver, filed suit in the Southern District of New York against Argentina and YPF for their failure to tender for Plaintiffs' YPF shares. Plaintiffs alleged that Argentina and YPF had breached their respective duties under YPF's bylaws by failing to make a tender offer for their YPF shares. *See* A33-40 (Compl. ¶¶ 50-85) (asserting breach of contract, anticipatory contract breach, breach of the implied duty of good faith and fair dealing, and promissory estoppel).[5]

Argentina and YPF moved to dismiss. As relevant here, they argued that they are immune from suit under the FSIA and invoked the act of state doctrine as an affirmative defense to liability. The district court (Preska, J.) issued a thorough opinion rejecting both grounds for dismissal.[6]

---

[5] Under Argentine corporate law, as under U.S. law, a corporation's bylaws bind both its shareholders and the corporation itself.

[6] The district court also rejected virtually all of Defendants' other arguments for dismissal, including *forum non conveniens*. The court held New York to be a proper forum for this lawsuit because "the Argentine government's threats of criminal prosecution against" Plaintiffs' counsel prevented Defendants from establishing "that Argentina is an adequate alternative forum," and because the facts have a clear nexus to the Southern District. SPA31-32 (Op. 31-32). It dismissed only Plaintiffs' promissory-estoppel claims and portions of their good-faith and fair-dealing claims as duplicative of Plaintiffs' contract claims. *See* SPA37-46 (Op. 37-46). These interlocutory rulings are not at issue in these appeals.

19

**a.** The district court held that Plaintiffs' lawsuit fell squarely within the third clause of the FSIA's "commercial activities" exception to foreign sovereign immunity, which applies if the claim is "based upon" acts taken "outside the territory of the United States in connection with a commercial activity of the foreign state" that "causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

As the district court explained, a claim is "based upon" the acts that constitute the "gravamen" of the complaint. SPA13 (Op. 13) (citing *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 107 (2d Cir.), *cert. denied*, 137 S. Ct. 493 (2016)). Here, the "gravamen" of Plaintiffs' complaint – namely, "Argentina's failure to issue a tender offer and YPF's failure to enforce the tender offer requirements that are contained in the Bylaws," *id.* – was plainly commercial, not sovereign, in nature. SPA13-14 (Op. 13-14). Plaintiffs alleged a straightforward failure to abide by the contractual obligations set forth in the bylaws of YPF, a private corporation, and settled FSIA precedent holds that "repudiating a contract falls within the commercial activity exception." SPA15-16 (Op. 15-16) (citing *de Csepel v. Republic of Hungary*, 714 F.3d 591, 599 (D.C. Cir. 2013), and *Guevara v. Republic of Peru*, 468 F.3d 1289, 1299 (11th Cir. 2006)).

Moreover, "[u]nder the FSIA, a foreign state engages in commercial activity 'where it acts in the manner of a private player within the market' and 'exercises only those powers that can also be exercised by private citizens, as distinct from those

20

powers peculiar to sovereigns.'" SPA15 (Op. 15) (quoting *Saudi Arabia v. Nelson*,
507 U.S. 349, 360 (1993)). Here, "once Argentina expropriated the YPF shares, it
assumed certain contractual obligations in the Bylaws." SPA16 (Op. 16). "By
entering into and repudiating [those] contractual obligations," "Defendants acted as
ordinary market players and engaged in commercial activity." SPA17 (Op. 17).

The district court squarely rejected Defendants' argument that Plaintiffs'
complaint challenged sovereign conduct because Argentina undertook the tender-
offer obligation when it expropriated Repsol's shares. The "method by which
Argentina acquired the shares" does not affect the commercial character of the
breach of the tender-offer obligation, which is the gravamen of the complaint. *Id.*
Indeed, "[t]he commercial contractual obligations at issue here could just as easily
have been triggered by Argentina's acquisition of a controlling stake in YPF in
open-market transactions." *Id.* The FSIA "permits [courts] to inquire into the
effects of sovereign acts on otherwise commercial obligations." *Id.*; *see* SPA16
(Op. 16) (noting that commercial activity that involves expropriated property or
that is conditioned on sovereign acts falls under the exception).

The district court further held that Argentina's and YPF's breaches caused a
direct effect in the United States. "'In order to be direct, an effect need not be
substantial or foreseeable, but rather must simply follow as an immediate consequence
of the defendant's activity.'" SPA17 (Op. 17) (quoting *Atlantica Holdings*, 813

21

F.3d at 108) (alteration omitted). In contract cases, "'a breach of a contractual duty causes a direct effect in the United States sufficient to confer FSIA jurisdiction so long as the United States is the place of performance for the breached duty.'" SPA18 (Op. 18) (quoting *Atlantica Holdings*, 813 F.3d at 108-09). Moreover, the effect need not be felt exclusively in the United States; thus, a direct effect occurs as long as part of the contractual performance is due in the United States. *See id.*

That standard is met here, because "the United States was the place of performance for certain contractual obligations under the Bylaws required to implement a tender offer, including the publication of the tender offer notices in New York, SEC filings detailing the tender offer, the delivery of tender offer materials to the NYSE, and, if demanded, the purchase of shares held in the United States." *Id.* (citing A22-23, A31 (Compl. ¶¶ 23, 44); A410 (Bylaws § 7(f))). "Defendants' failure to perform these contractual obligations necessarily had an immediate and direct effect in the United States." SPA19 (Op. 19).

Because the district court held that jurisdiction was proper under the third clause of the FSIA's commercial-activities exception, it did not need to consider Plaintiffs' argument that the first clause, which allows lawsuits "based upon a

commercial activity carried on in the United States by the foreign state," 28 U.S.C. § 1605(a)(2), provides jurisdiction here.[7]

**b.** The district court further rejected Defendants' argument that the suit should be dismissed under the act of state doctrine. That doctrine does not create immunity from suit, but rather is a "substantive defense on the merits." SPA20 (Op. 20). Accordingly, dismissal on act of state grounds is proper only if the doctrine's "'applicability is shown on the face of the complaint.'" *Id.* (quoting *Konowaloff v. Metropolitan Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012)).

The act of state defense applies only where Plaintiffs' claim necessarily requires a U.S. court to decide "the validity of a public act of a foreign sovereign within its territory." *Id.* The defense does not apply here, however, because "the outcome of this case does not turn on the validity of Argentina's official acts but rather on the operation of YPF's Bylaws in light of those acts." SPA22 (Op. 22). The district court explained that it "d[id] not appear from the face of the Complaint that Defendants' failure to comply with or enforce those Bylaws constituted an official act or was compelled by an official act." SPA22-23 (Op. 22-23). Indeed, as explained above, the Expropriation Law and Executive Decree did not displace the bylaws. To the contrary, the Expropriation Law "placed Argentina in the position

---

[7] As explained *infra* § II.B, the district court can be affirmed on this ground as well.

of Repsol with respect to the shares subject to expropriation, leaving commercial rights and obligations intact." SPA23 (Op. 23). Because accepting the validity of those official acts would not "preclude inquiry into contractual obligations related to or arising out of those acts," "the Court does not have to inquire into the validity of the sovereign acts" of Argentina or YPF to resolve Plaintiffs' claims. SPA24 (Op. 24); *see also* SPA21-22 (Op. 21-22) (distinguishing *Braka v. Bancomer, S.N.C.*, 762 F.2d 222 (2d Cir. 1985), in which granting plaintiffs' requested relief would have required "directing a state-owned entity to violate its own national law," *id.* at 225).[8]

7. On September 23, 2016, Argentina and YPF filed notices of interlocutory appeal of the district court's FSIA conclusion. *See* A606, A607 (Dkt. #66, #67). Four days later, Argentina and YPF requested by letter that the district court certify its decision on the act of state question for immediate appeal under 28 U.S.C. § 1292(b). *See Petersen*, Dkt. #68, #69.

The district court certified the issue on October 7, 2016. *See* Memorandum & Order, *Petersen*, Dkt. #74. On October 17, 2016, Argentina and YPF petitioned

---

[8] The district court also noted, citing reasoning endorsed by four Justices in *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976), that the act of state doctrine "does not . . . apply to the purely commercial conduct of a foreign sovereign." SPA21 (Op. 21). But the court's ruling did not depend on a bright-line rule that commercial conduct can never trigger the act of state defense. Rather, it held that Plaintiffs' claims, in addition to challenging commercial conduct, did not require the court to pass judgment on the validity of any official act.

this Court for permission to appeal the act of state issue. The Court has referred

those petitions to the merits panel. *See* Order, No. 16-3510, Dkt. #24 (2d Cir. Feb.

14, 2017).

## SUMMARY OF ARGUMENT

**I.**     Under the FSIA, 28 U.S.C. § 1605(a)(2), a lawsuit is "based upon"

commercial activity when such activity constitutes the "gravamen" of the

complaint. The gravamen of Plaintiffs' complaint is quintessential commercial

conduct. Argentina and YPF entered into a commercial contract (the bylaws) in

which they undertook a commercial obligation (to compensate shareholders using

a tender offer in the event YPF were to become renationalized), and they then

breached that commercial obligation by refusing to make that tender offer when

Argentina in fact reacquired control of the Company. The formation and

repudiation of commercial contracts is precisely the type of conduct that this Court

and the Supreme Court have repeatedly held constitutes commercial activity

justiciable under the FSIA.

Defendants dispute that straightforward conclusion only by mischaracterizing

Plaintiffs' claims as a direct challenge to Argentina's distinct expropriation of

Repsol's 51% stake. But, as the complaint and lower-court pleadings make clear,

Plaintiffs have never challenged the expropriation, which has been completed and

which Plaintiffs do not seek to reverse. Defendants argue that Plaintiffs *must* be

challenging the expropriation because, they say, the bylaws precluded the expropriation from being consummated *except* through a tender offer or, alternatively, until *after* the tender offer took place. But, as the district court correctly held, that is not what the bylaws say. The bylaws simply provide that if Argentina acquires a controlling interest "by any means," it must also make the tender offer. Any other reading would be farcical given that the reason Argentina was making such promises in the first place was to reassure investors in a multi-billion-dollar IPO that they would be protected against exactly the kind of opportunism in which Argentina ultimately engaged. Moreover, regardless of exactly when the tender offer should have occurred, Defendants' failure to make a tender offer at any time was a breach of a commercial obligation, not sovereign conduct. The timing of the tender-offer obligation thus makes no difference to the commercial nature of Defendants' claims.

Nor is Plaintiffs' claim inconsistent with any other aspect of the Expropriation Law. The Expropriation Law authorized Argentina to use the specific process of expropriation to seize 51% of YPF's stock. It did not in any way limit Argentina's authority to purchase additional stock by other means. Nor did it prevent Argentina or YPF from abiding by their commercial obligations; to the contrary, the Expropriation Law affirmatively provided that Argentina would be subject to the same shareholder rights and obligations as its predecessor in

interest (Repsol) and that YPF would be operated as a commercial enterprise in the interests of its shareholders.  The conclusion of Argentina's paid expert that, in general, public laws trump private agreements is entirely irrelevant here because the bylaws do not conflict with any public law.  And Defendants are incorrect in arguing that this Court must simply defer to that expert's general opinions despite the clear language of the Expropriation Law.

**II.**    Argentina does not dispute, nor could it, that its breach of contract caused direct effects in the United States and thereby satisfied the third prong of § 1605(a)(2).  The United States was one of the places where Argentina was required to perform its contractual tender-offer obligation, and its failure to do so harmed many U.S.-based investors and triggered losses to Petersen on shares that were held for it in New York City.  Under long-settled Second Circuit and Supreme Court precedent, the direct-effects test is satisfied.  And because YPF, like Argentina, was a party to the bylaws responsible for ensuring the contract's enforcement, its breach had precisely the same effects as Argentina's.

Although it need not decide the issue, this Court can also affirm the district court's judgment under the first clause of § 1605(a)(2).  That clause applies to commercial activity "carried on in the United States," which the FSIA defines as conduct having "substantial contact with" the United States.  28 U.S.C. § 1603(e). As the case law makes clear, where, as here, formation of a contract had substantial

27

connections to the United States (a public offering on the NYSE, registered with the SEC) and substantial elements of the contract were to be performed in the United States (a tender offer on the NYSE for shares held in New York), the "substantial contact" requisite is satisfied.

**III.**     The act of state doctrine is not jurisdictional, but rather a merits defense on which Defendants bear the burden of proof.  As such, the denial of a motion to dismiss on act of state grounds does not present the type of pure legal issue that normally warrants interlocutory review under 28 U.S.C. § 1292(b).  If the Court reaches the issue in this case, however, it should affirm for the same core reason it should affirm the district court's FSIA ruling:  Petersen is not challenging the validity of the Expropriation Law but rather the separate commercial act of refusing to make the tender offer.  Moreover, the fact that Defendants failed to make the tender offer in the United States, including to U.S. investors, means that Argentina's actions did not occur solely within its borders, and thus are not covered by the act of state defense.

## STANDARD OF REVIEW

"The standard of review applicable to district court decisions regarding subject matter jurisdiction under the FSIA is clear error for factual findings and *de novo* for legal conclusions." *Robinson v. Government of Malaysia*, 269 F.3d 133, 138 (2d Cir. 2001). This Court has called the act of state doctrine a "prudential" doctrine, *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995), and has assumed that a district court's act of state rulings are subject to abuse of discretion review, *see Bigio v. Coca-Cola Co.*, 239 F.3d 440, 452 n.7 (2d Cir. 2000).

The decision whether to accept appellate jurisdiction of Defendants' appeals of the district court's act of state ruling under 28 U.S.C. § 1292(b) is subject to this Court's discretion. *See* 28 U.S.C. § 1292(b); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 23 (2d Cir. 1990). The Court will typically "first determine whether the district court properly found that the requisites for section 1292(b) certification have been met." *Klinghoffer*, 921 F.2d at 23. Even if they are, the Court may reject the appeals for any reason, including if Defendants fail to "persuad[e] the court that exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *In re Prudential Lines, Inc.*, 59 F.3d 327, 332 (2d Cir. 1995) (alteration omitted).

29

## ARGUMENT

## I.    THE FEDERAL COURTS HAVE JURISDICTION OVER THIS SUIT UNDER THE FSIA'S "COMMERCIAL ACTIVITIES" EXCEPTION

### A.    The District Court Correctly Held That the Gravamen of Plaintiffs' Complaint Is Defendants' Commercial Activity in Breaching the Bylaws' Tender-Offer Obligation

The FSIA simultaneously bars certain lawsuits against sovereign nations, *see* 28 U.S.C. § 1604, while affirmatively conferring federal subject-matter and personal jurisdiction over suits that fall into any of its "statutorily defined exceptions." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610-11 (1992); *see* 28 U.S.C. § 1330(a), (b); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 435 & n.3 (1989) ("[P]ersonal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity in §§ 1605-1607 applies.").  "The single most important exception to foreign state immunity under the FSIA, and the only one at issue in this case, is the commercial-activity exception."  *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 106 (2d Cir.), *cert. denied*, 137 S. Ct. 493 (2016) (citation omitted).

That exception contains "three independent clauses."  *Id.*  The first clause permits lawsuits "based upon a commercial activity carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(2).  The third clause exempts lawsuits based "upon an act outside the territory of the United States in connection with a

30

commercial activity of the foreign state elsewhere," where that extra-territorial act "causes a direct effect in the United States." *Id.*[9]  The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 1603(d).  The Supreme Court has explained that a foreign sovereign's actions are commercial, rather than sovereign, when the state "acts, not as regulator of a market, but in the manner of a private player within it." *Weltover*, 504 U.S. at 614.

In determining whether a lawsuit is based upon commercial activity, a court looks to "'the particular conduct that constitutes the gravamen of the suit.'" *Atlantica Holdings*, 813 F.3d at 107 (quoting *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015)).[10]  The "gravamen" of the suit is "the basis or foundation of a claim, i.e., those elements . . . that, if proven, would entitle a plaintiff to relief." *Id.* (ellipsis in original).  Here, Defendants do not dispute that "'[a] company's . . . bylaws in substance are a contract between the corporation and its shareholders and

---

[9] The second clause, which is not at issue here, excepts lawsuits based upon "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2).

[10] Unlike the first clause, the third clause requires only that the suit be based upon "an act . . . *in connection with* a commercial activity." 28 U.S.C. § 1605(a)(2) (emphasis added).  Any distinction between the two clauses is academic in this case, however, because Petersen's claim is based directly on commercial activity. *Cf. Hanil Bank v. PT. Bank Negara Indonesia*, 148 F.3d 127, 131 (2d Cir. 1998) (act "in connection with a commercial activity" is one with "a substantive connection or a causal link" with commercial activity).

31

among the shareholders.'"  SPA13 (Op. 13 n.3) (quoting *M+J Savitt, Inc. v Savitt*, No. 08 Civ. 8535 (DLC), 2009 WL 691278, at *9 (S.D.N.Y. Mar. 17, 2009)) (ellipsis in original); *accord Oliveira v. Quartet Merger Corp.*, 662 F. App'x 47, 48 (2d Cir. 2016) (summary order).  The district court correctly recognized that the gravamen of Petersen's lawsuit is straightforward:  Defendants' refusal to tender for Petersen's shares breached their obligations under the parties' contract – namely, the bylaws – and caused substantial monetary harm to Petersen (as well as to major U.S.-based investors, such as Eton Park, *see supra* pp. 14-15).  *See* SPA13 (Op. 13) ("[T]he particular conduct that constitutes the gravamen of the Complaint is Argentina's failure to issue a tender offer and YPF's failure to enforce the tender offer requirements that are contained in the Bylaws.").

The district court correctly held that Defendants' breach of their contractual obligations under the bylaws constituted quintessential commercial activity under the FSIA.  SPA15 (Op. 15).  On that issue, the court was on unimpeachable ground, as courts have repeatedly held that contract breach is commercial, not sovereign conduct.  *See de Csepel v. Republic of Hungary*, 714 F.3d 591, 599 (D.C. Cir. 2013) ("a foreign state's repudiation of a contract is precisely the type of activity in which a private player within the market engages"); *Guevara v. Republic of Peru*, 468 F.3d 1289, 1299 (11th Cir. 2006) (FSIA permits litigants to "use the courts of this country to compel [a foreign state] to keep its contractual promise" where "[t]he underlying activity at issue . . . is commercial in nature");

32

*Janini v. Kuwait Univ.*, 43 F.3d 1534, 1537 (D.C. Cir. 1995) ("Private parties often repudiate contracts in everyday commerce and may be held liable therefor.").

As the district court correctly held, moreover, the fact that Argentina's expropriation of Repsol's shares was the triggering event for the contractual obligation does not convert the breach of that obligation from a commercial act to a sovereign one. Regardless of how Argentina acquired its shares, that acquisition triggered Defendants' contractual obligation to tender for the remaining shareholders' shares – no different than if Argentina had acquired the shares through a purely commercial transaction, and no different than if another non-sovereign shareholder had acquired a similar controlling interest. *See* SPA17 (Op. 17) ("The commercial contractual obligations at issue here could just as easily have been triggered by Argentina's acquisition of a controlling stake in YPF in open-market transactions.").

The district court correctly applied the well-settled principle that "claims arising out of a contract that is conditioned on sovereign action may fall within the commercial-activity exception." SPA16 (Op. 16). For example, in *Guevara v. Republic of Peru*, the Eleventh Circuit held that breach of a promise to pay a reward for information leading to the capture of a fugitive constituted commercial activity. Even if the government's payment obligation were conditioned on capture of the fugitive, which is a sovereign act, the sovereign nature of the

*condition* would not change the "quintessentially commercial" nature of the

*promise to pay*. 468 F.3d at 1300.

The Eleventh Circuit gave another example that is directly analogous to this

case:

> Suppose that a country contracts to buy bullets from a private
> manufacturer. We know that transaction would be a commercial
> activity because the Supreme Court has said so [in *Weltover*, 504 U.S.
> at 614]. . . . If the country conditioned the contract on it declaring war
> on a neighbor before the scheduled date of delivery, we would still
> have a commercial contract under which, if war is declared, the
> private party is obligated to supply bullets and the country would be
> obligated to pay for them. The condition precedent of a declaration of
> war speaks to the purpose or motivation for buying the bullets, but it
> does not change the commercial nature of the acts of purchasing and
> paying for them. Enforcing the contract would not impinge on
> sovereignty, because it would not force the country to declare war or
> to refrain from doing so. . . . Paying an amount owed under a contract
> is not itself a sovereign act.

*Id*.

Likewise, in *Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*, No.

12 Civ. 7316 (LGS), 2014 WL 288705 (S.D.N.Y. Jan. 27, 2014), Judge Schofield

explained that, although the FSIA bars a direct challenge to a foreign sovereign's

expropriation, it does not bar a challenge to "*post-intervention* commercial activity."

*Id.* at \*5 (emphasis added). For example, "[i]f an expropriated bank, operated by a

sovereign, repudiated loans in its function as an operating bank, and the creditor

sought to recover for a breach of contract, the commercial activity exception would

apply." *Id*.

34

The reasoning of *Guevara* and *Smith Rocke* applies straightforwardly here. The promise to make a tender offer is commercial, not sovereign. The fact that Argentina chose to trigger its contractual obligation through a sovereign act rather than some other means does not change the commercial nature of the tender-offer requirement. Enforcing this contract does "not impinge on [Argentina's] sovereignty," because the contract never "force[d] the country to [expropriate the shares] or to refrain from doing so." *Guevara*, 468 F.3d at 1300.

Defendants' invocation of *Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) (cited by Argentina at 39-40), is thus fundamentally misplaced. Plaintiffs' lawsuit in *Garb* sought compensation for "the Polish Government's expropriation of th[e] [plaintiffs'] property" during the Second World War. 440 F.3d at 581. Because the claims were "'based upon' th[ose] acts of expropriation," they were barred by the FSIA "regardless of the subsequent commercial treatment of the expropriated property." *Id.* at 586. This lawsuit, by contrast, does *not* challenge the expropriation of Repsol's shares; it challenges Defendants' breach of corporate bylaws, which remains commercial regardless of how the commercial obligation was triggered or why Defendants breached.

Argentina could have expropriated *YPF*; if it had done so, it would have had to pay compensation to *all* YPF shareholders for that taking. Argentina deliberately did not take that route. Instead, it expropriated only Repsol's 51% of

35

the Company, kept YPF a private commercial enterprise, and left all of the other shareholders' contractual rights intact. Petersen's suit for breach of those contractual rights challenges commercial conduct and thus is justiciable under the FSIA.

**B.    Defendants' Course of Commercial Conduct in Enacting the Amended Bylaws Further Supports the Applicability of the Commercial-Activities Exception**

In addition to the commercial nature of Defendants' contract *breach*, the facts surrounding the *formation* of the bylaws and its tender-offer obligation further support the conclusion that Petersen's claims are based upon commercial activity. Contract formation is an essential element of any breach-of-contract claim, and thus constitutes part of the "gravamen" of Plaintiffs' suit. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir. 1996) ("Two elements give rise to a breach of contract claim: (i) a contract between the parties and (ii) an act allegedly in violation of that agreement.").

As set out above (at 10-12), Argentina and YPF amended YPF's bylaws to include the tender-offer requirement as part of its years-long effort to raise capital by selling YPF shares to private investors on U.S. stock exchanges. Both the Supreme Court and this Court have recognized that when foreign states raise capital through public markets – for example, through an IPO – they engage in commercial activity characteristic of a market participant, not sovereign conduct

36

unique to governments. *See Weltover*, 504 U.S. at 615 (holding that issuing "garden-variety debt instruments" that "may be held by private parties[,] . . . are negotiable[,] . . . may be traded on the international market[,] . . . and . . . promise a future stream of cash income" is commercial activity); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir. 1991) ("[i]t is self-evident that issuing public debt is a commercial activity"); *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 750 (S.D.N.Y. 2004) (commercial-activities exception triggered where, "[t]o raise capital, the Sovereign defendants allegedly solicited buyers" of securities "and navigated the world of private commerce to achieve their financial goals"), *clarified on other grounds on denial of recon.*, No. 02 Civ. 6356(SHS), 2005 WL 2585227 (S.D.N.Y. Oct. 13, 2005); *see also EM Ltd. v. Republic of Argentina*, 389 F. App'x 38, 44 (2d Cir. 2010) (summary order) (holding, in an analogous context, that funds held by Argentina "to facilitate the sale of . . . ADSs" were "being used for a commercial activity"). Under that well-established principle, the privatization of a state-owned entity is commercial rather than sovereign activity. *See Daventree*, 349 F. Supp. 2d at 750 (holding that "the conversion of state-owned entities into free-market enterprises" "[is] a commercial activity for the purpose of the FSIA"); *WMW Mach., Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*, 960 F. Supp. 734, 740 (S.D.N.Y. 1997) (same).

Likewise, the Supreme Court and this Court have held that entering into a contract is clearly commercial activity in which any "private player within the

37

market" could engage. *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993); *see NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 258 (2d Cir. 2012) (an agreement "in the nature of a private contract for the purchase of goods . . . constitute[s] commercial activity"); *de Csepel*, 714 F.3d at 600 (FSIA permitted suit premised on "creation and repudiation of" contracts governing bailment of *previously expropriated* property). In this case, Argentina amended the bylaws – and thus entered into the relevant contract – using its controlling position as majority shareholder, and not its authority as sovereign. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449-50 (D.C. Cir. 1990) (government shareholder's alleged abuse of its majority position and denial of minority shareholders' dividends constituted commercial activity).

Thus, Petersen's suit is "based upon" commercial activity, both because Defendants' contract *breach* is commercial activity and because the *formation* of the parties' contract was the product of Defendants' lengthy course of commercial conduct. *See* 28 U.S.C. § 1603(d) (defining commercial activity not only as particular acts, but also as "a regular course of commercial conduct").[11]

---

[11] Argentina also incorrectly claims (at 40-41) that Petersen's anticipatory breach and duty of good-faith and fair-dealing claims are based on sovereign conduct. But for the same reasons Defendants' failure to tender was commercial activity, Argentina's repudiation of the tender-offer requirement (A28-29 (Compl. ¶ 38)) was a commercial act, no different from any party's anticipatory breach. *See de Csepel*, 714 F.3d at 599 ("repudiation of a contract" is commercial activity).

### C. The District Court Correctly Rejected Defendants' Effort To Recharacterize Petersen's Claim as a Challenge to Argentina's Expropriation of Repsol's Shares

*1. Plaintiffs' Claim Challenges the Contractual Failure To Tender for Petersen's Shares, Not the Expropriation of Repsol's Shares*

Defendants do not dispute that the bylaws are a commercial contract or that a failure to make a tender offer is commercial rather than sovereign conduct. Rather, their argument for immunity depends on recharacterizing Petersen's claim as a challenge to the legality of the expropriation of Repsol's shares. Those arguments cannot succeed, because the FSIA's commercial-activities analysis focuses on Plaintiffs' actual claims, rather than other, hypothetical claims that Plaintiffs might have brought. *See Nelson*, 507 U.S. at 356 ("We begin our analysis by identifying the particular conduct on which *the Nelsons' action* is 'based' for purposes of the Act.") (emphasis added); *Sachs*, 136 S. Ct. at 396 (noting that the *Nelson* Court "zeroed in on the core of [the plaintiffs'] suit"). Here, Petersen has made clear at every turn that it merely seeks damages for Defendants' failure to tender, which is commercial conduct, and is not implicating the expropriation. As in any litigation, Petersen is the master of its complaint, *see, e.g.*, *Domnister v. Exclusive Ambulette, Inc.*, 607 F.3d 84, 90 (2d Cir. 2010), and Defendants cannot obtain FSIA dismissal on the basis of a different claim than what Petersen has pleaded.

39

2.    *Argentina's Efforts To Distort Plaintiffs' Claim Into a Challenge to the Expropriation Misread the Bylaws*

Argentina makes several unpersuasive arguments in its effort to recharacterize Plaintiffs' claims as a challenge to the expropriation of Repsol's shares.

*a.*    First, Argentina mischaracterizes Petersen's claim as asserting that "Argentina should have taken control of YPF under the bylaws *rather than* through its sovereign acts of intervention and expropriation."  Br. 24 (emphasis added).  But Petersen has never claimed that Argentina was required to acquire Repsol's 51% stake in YPF through a tender offer rather than expropriation nor ever questioned the legality of Argentina's expropriation.  Rather, as the district court correctly understood, Petersen has consistently argued that Argentina's acquisition of Repsol's shares through expropriation triggered an *independent* contractual obligation under the bylaws to tender for the remaining shares, including Petersen's.  *See*, *e.g.*, A14 (Compl. ¶ 3) (alleging that Argentina expropriated Repsol's shares without making the required tender offer for Petersen's shares); SPA16-17 (Op. 16-17) ("[O]nce Argentina expropriated the YPF shares, it assumed certain contractual obligations in the Bylaws.").

Petersen's claim is consistent with the plain language of the bylaws, which make clear that Defendants' tender-offer obligation is triggered by Argentina's acquisition of shares "by any means or instrument."  A432 (Bylaws § 28).  Thus,

40

Petersen need not (and does not) challenge the legality of the expropriation in order to challenge the failure to perform the bylaws' distinct tender-offer obligation.

      ***b.***      Argentina also contends (at 31-34) that Petersen cannot challenge the failure to tender without also challenging Argentina's expropriation of Repsol's shares because the bylaws require that the tender offer be completed before any acquisition of control can become effective. That argument is wrong for two reasons. First, as the district court correctly held, the premise of the argument is incorrect: the bylaws provide that Argentina must make a tender offer upon acquiring the requisite interest in YPF; they do not mandate that Argentina complete the tender offer *prior to* the acquisition. Second, the timing of Argentina's tender-offer obligation is, at most, a merits question and does not change the commercial nature of Petersen's claim for breach of contract, which challenges Defendants' failure to tender under the parties' commercial agreement, not the failure to tender *prior to* the acquisition of control.

      ***i.***      As the district court correctly held, the bylaws fully support Petersen's claim that, "once Argentina expropriated the YPF shares, it assumed certain contractual obligations in the Bylaws." SPA16 (Op. 16). Argentina's suggestion that the bylaws would have compelled Argentina to complete any tender offer prior to the acquisition rests on a misreading of the relevant provisions. Indeed, at oral argument below, Argentina's counsel admitted that he had to "insert the word

'first'" into the bylaws' language to make it support Defendants' argument. A538 (Tr. of Hr'g on Mot. To Dismiss 8:19 (July 20, 2016) ("Hr'g Tr.")).

The relevant bylaw provision governing acquisitions by Argentina, § 28, provides that the tender-offer requirement shall apply to all acquisitions "by any means," "if, *as a consequence* of such acquisition, the National Government *becomes* the owner" of a controlling stake of YPF. A432 (Bylaws § 28(A)) (emphases added). The plain language of that section makes clear that the tender offer is triggered "if" Argentina "becomes" the controlling shareholder "as a consequence" of its purchase; the tender offer need not precede the takeover transaction. That makes eminent sense, because the core purpose of the tender-offer provision is to require Argentina to make a tender for the *remaining* shareholders' shares upon acquiring a controlling stake in YPF through "any means."

The three provisions Argentina cites (at 32-33) reinforce that conclusion. The first is taken from § 7(d), which is not the bylaw provision governing acquisitions *by Argentina*. *See* A432 (Bylaws § 28(A)) (requiring Argentina to comply with "subsections e) and f) of Section 7"). In any event, even Argentina acknowledges (at 32) that § 7(d) at most "requires a party undertaking a [control acquisition] to comply with" the bylaws' tender-offer provision. It does not

expressly mandate that the tender offer must be completed prior to the control acquisition.[12]

The second section – § 7(e) – contradicts Defendants' position. Section 7(e) states: "The person wishing to [undertake a control acquisition] . . . shall: (i) Obtain the prior consent of the special shareholders' meeting of class A shareholders; and (ii) Arrange a takeover bid for the acquisition of all the shares of all classes of the Corporation and all securities convertible into shares." A410. A comparison of the language of § 7(e)'s two subclauses is telling. Section 7(e)(i) expressly requires "the *prior* consent" of Class A shareholders; by contrast, the absence of the word "prior" or any other similar modifier in § 7(e)(ii) indicates that the tender offer is not a precondition to the effectiveness of the control acquisition. The bylaws simply require an acquirer to "arrange a takeover bid," but do not suggest that the acquirer must complete the tender offer "prior" to its control acquisition.

---

[12] The language of § 7(d) – which Argentina does not quote in its brief – does not support its contention. *See* A409 (Bylaws § 7(d)) ("[i]f the terms of [the tender-offer provisions] are not complied with, it shall be forbidden to acquire shares" that constitute a control acquisition). The word "shall," in this context, is the imperative, not the future tense, as is made clear by a different translation of the bylaws YPF filed with the SEC, which states: "No Company share . . . may be acquired either directly or indirectly, by any means or under any title *unless* the provisos of paragraphs e) and f) of this Section are complied with. . . ." https://www.sec.gov/Archives/edgar/data/904851/000119312506147059/dex12.htm. The use of the word "unless" confirms that § 7(d) does not require any particular temporal sequence. Defendants' position requires rewriting § 7(d) by replacing the word "unless" with "until."

43

Grasping at straws, Defendants invoke a single word ("once") in a third provision – § 7(f)(ix). Tellingly, Defendants did not invoke that provision in the district court, either in their motion to dismiss briefing or at oral argument. That is because the timing discussed in § 7(f)(ix) applies to a circumstance not applicable here. It addresses the mechanics of the tender offer when a *private* party acquires the requisite number of shares through a "Prior Agreement" with another shareholder. *See* A410, A413 (Bylaws § 7(f)(i), (ix)). Where a party has entered into such "Prior Agreement" – which is defined to include a future agreement that the acquirer might "intend to enter into with a holder of shares of the Corporation," A410 (*id.* § 7(f)(i)) – § 7(f)(ix) provides that the acquirer "may execute the Prior Agreement" "once" the tender offer has been completed. A413. But that provision, which is not a model of clarity, has no application in this case, because Argentina acquired control of 51% of YPF not through an agreement with another shareholder but through the expropriation of Repsol's shares. Section 28 governs Argentina's tender-offer obligation when it acquires shares through "any means or instrument," and it does not dictate that the tender offer precede the acquisition, as discussed above.

Defendants cobble together out-of-context snippets from Petersen's complaint and expert declarations in an effort to suggest that Petersen "concedes" that the bylaws require the tender offer to precede the control acquisition. Argentina Br.

44

33.  To the contrary, Petersen made its position clear in its complaint and in the motion to dismiss briefing and argument:  the bylaws provide that a control acquisition *triggers* a tender-offer obligation.  *See Petersen*, Dkt. #44, at 13 ("Plaintiffs do not challenge the expropriation of Repsol's shares; they challenge Argentina's breach of its contractual duty to make a tender offer for Plaintiffs' shares.").  Nor are the expert reports Defendants cite remotely supportive of their point.  Dr. Rovira plainly testified that "Argentina's decision to exercise th[e] rights [to expropriate Repsol's shares] constituted its takeover of 'control' and *triggered* the obligations in the YPF bylaws."  A475 (Rovira Decl. ¶ 39).  Dr. Bianchi likewise explained that "the Argentine State performed its 'takeover' of YPF in accordance with Section 28 of its Bylaws, and *this immediately triggered* the obligation to carry out a [tender offer]."  A505 (Bianchi Decl. ¶ 48).  Furthermore, the district court correctly recognized Petersen's position.  *See* A536 (Hr'g Tr. 6:1-3) (quoting Petersen expert's opinion that the tender offer is "not subject to any condition or time period that might delay or jeopardize either the temporary taking

45

or the expropriation").[13]   Indeed, even Defendants acknowledged that this was Petersen's position in their motion to dismiss briefs.[14]

    *ii.*      In addition to being incorrect, Defendants' reading of the bylaws is irrelevant to the FSIA issue, because it does not convert Plaintiffs' challenge to the failure to tender into a challenge to sovereign conduct.   Defendants apparently read the bylaws to mean that Argentina had an obligation to tender *only* before it took control of YPF; after the moment it took control, they say, any tender-offer obligation vanished.   That argument still does not change the commercial nature of the failure to make a tender offer.   At most, it is an argument that Plaintiffs' claim fails on the merits because Argentina's tender-offer obligation under the bylaws did not survive the acquisition of control.   But Defendants never asserted any such merits defense in their motions to dismiss (and, even if they had, it would not

---

[13] As Petersen's expert concluded:   "There is no incompatibility at all between the expropriation or the temporary taking of Repsol's YPF stock and the [tender offer], insofar as the [tender offer] does not prevent, hinder or restrict the State in its sovereign power to temporarily take or expropriate Repsol's YPF stock and exercise any of the rights vested in it."   A508 (Bianchi Decl. ¶ 67).

[14] *See Petersen*, Doc. #33, at 7 (YPF briefing stating Petersen's "complaint alleges that the obligation to launch a tender offer arose as a result of the Republic's assumption of control over YPF's Class D shares, i.e., the intervention of YPF and expropriation of a controlling stake in the company"); *Petersen*, Doc. #28, at 12 (Argentina brief quoting Petersen's complaint as alleging that "'Argentina acquired a majority stake in YPF, usurped the function of its board and president, and took over governance of the Company – *all without making the tender offer* required by the bylaws and promised in the U.S. IPO Prospectus'") (quoting A14 (Compl. ¶ 3) (emphasis in brief)).

46

properly be before this Court on interlocutory appeal from a denial of sovereign immunity).

Nor, in all events, would such an argument prevail as a matter of common sense and basic principles of contract law. Given that the core purpose of the tender-offer requirement was to ensure that shareholders were protected from renationalization by Argentina, it would be absurd to construe the tender-offer obligation as evaporating the minute Argentina acquired a controlling interest. *See*, *e.g.*, *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 380 F.3d 704, 710-11 (2d Cir. 2004) (contracts should be interpreted consistent with reasonable commercial expectations). Moreover, contract law protects the parties' right to "substantial performance," which "does not require performance in exact correspondence with the contracted obligation." *Bernard v. Las Americas Commc'ns, Inc.*, 84 F.3d 103, 108 (2d Cir. 1996); *see* Restatement (Second) of Contracts § 270(a) (1981) ("[w]here only part of an obligor's performance is impracticable, his duty to render the remaining part is unaffected if . . . it is still practicable for him to render performance that is substantial"). Thus, even if, as Defendants claim, the bylaws technically required the tender to be made prior to expropriating Repsol's shares, that would not relieve Defendants of the obligation to make the tender offer even *after* the acquisition of control. Whether the tender offer should have occurred before or after, the result is the same: Plaintiffs had a contractual right to a tender offer for their shares at a price provided for under the

47

bylaws and are entitled to damages for Defendants' breach of that obligation. Under no circumstances would Defendants' argument compel Plaintiffs to challenge the legality of Argentina's expropriation as part of its breach-of-contract claim.

It bears repeating that Petersen's lawsuit is a suit for damages. Petersen has never sought to enjoin Argentina's expropriation of Repsol's shares. Its suit thus cannot be characterized as "directly challeng[ing] Argentina's intervention and expropriation." Argentina Br. 30-31.[15] Awarding damages to Petersen would simply recognize that Argentina and YPF breached their commercial obligations under the bylaws to make a tender offer for *Petersen*'s shares – whatever order the bylaws envisioned and whatever the reason for the breach. *See* 28 U.S.C. § 1603(d) ("The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."); SPA17 (Op. 17) ("[T]he FSIA permits this Court to inquire into the effects of sovereign acts on otherwise commercial obligations."). It would have no impact on Argentina's ownership of *Repsol's* shares pursuant to the Expropriation Law.

---

[15] As the leading treatise on remedies notes, "[c]ontract remedies are traditionally money remedies rather than coercive remedies." 3 Dan. B. Dobbs, *Law of Remedies* § 12.8(2), at 197 (2d ed. 1993). And specific relief is typically denied when "the legal remedy is regarded as adequate." *Id.* § 12.8(1), at 190; *accord* 24 *Williston on Contracts* § 64:1 (4th ed. 2002).

The Eleventh Circuit's decision in *Guevara* is again instructive. In *Guevara*, the court noted that, if a foreign government contracted to buy bullets in the event of a declaration of war, it could still be held to account under the FSIA if war were declared and it refused to pay for the bullets. Awarding damages would not require review of the validity of the declaration of war; it would merely compensate the government's failure to abide by its commercial obligations. So too here: awarding damages to Petersen would not require finding that the Executive Decree or the Expropriation Law is invalid; rather, it would honor Defendants' obligation to insure Petersen against the very change in circumstances that ultimately came to pass.[16]

At bottom, Argentina's misguided effort to transform this litigation into a dispute over *when* a tender offer should occur, rather than *whether* a tender offer should occur, misses the point. Argentina's arguments about the precise timing of the tender-offer obligation under the bylaws might be more relevant if Petersen's

---

[16] *See United States v. Winstar Corp.*, 518 U.S. 839, 868-69, 871 (1996) (plurality) (obligation "to pay damages in the event [of contract breach]" does not implicate sovereign immunity, even where the failure to perform is caused by a change in the law; such a contract has the effect of "insur[ing] the promise against loss arising from the promised condition's nonoccurrence"). The plurality distinguished such a contract from one in which the government specifically binds itself *not to take* certain sovereign acts. *See id.* at 868 ("Nothing in the documentation . . . purported to bar the Government from changing the way in which it regulated . . . ."). The same is true here: Argentina did not contract away its right to use the sovereign tool of expropriation.

claim was that Argentina's tender offer was tardy. But, here, Plaintiffs' claim is that Argentina *never* conducted a tender offer; the timing of that obligation does not affect the commercial nature of the "gravamen" of that claim.

3.   *The District Court Correctly Concluded That the Expropriation Law Did Not Impliedly Preempt the Tender-Offer Requirement*

Argentina also argues (at 34) that it could not both tender for Plaintiffs' shares as required by the bylaws and abide by the terms of the Expropriation Law and the Executive Decree. That is incorrect. As the district court correctly held, nothing in the Executive Decree or the Expropriation Law overrules any bylaw provision or requires any action inconsistent with the bylaws. And, even if it were the case that the Expropriation Law directed Argentina to ignore the bylaws, that would not be Petersen's problem, because the bylaws constitute a commercial guarantee that Plaintiffs and other YPF shareholders would be protected against any effort by Argentina to renationalize the Company.

*First*, Argentina argues (at 35) that a tender offer would not have been sufficiently "urgen[t]" and thus would not have granted the government the "immediate[ ]" control authorized by the Executive Decree. But, as explained above, Petersen does not contend that the tender offer must have preceded Argentina's acquisition of control, and nothing in the bylaws supports that conclusion. The tender offer thus did not stand in the way of Argentina's immediate exercise of control.

50

*Second*, Argentina also argues (at 35-36) that the Executive Decree and the Expropriation Law provided that Argentina would acquire exactly a 51% stake in YPF stock, whereas Argentina would have acquired "either fewer or (more likely) far more than 51%" had it acquired the controlling stake through a tender offer. That is simply a reprise of Defendants' erroneous argument that the bylaws required Argentina to acquire its controlling stake through a tender offer. *See supra* pp. 40-41. Again, Petersen's position – consistent with the bylaws – is that Argentina's expropriation of Repsol's 51% stake triggered a duty to tender for Petersen's shares.

Similarly, contrary to Argentina's argument (at 39), nothing in the Expropriation Law or the Executive Decree supports the conclusion that Argentina was required to "acquire *exactly 51%* ownership in YPF." As the district court correctly held, "[t]he law did not address the acquisition of additional shares in the marketplace, including by tender offer." SPA23 (Op. 23). The Expropriation Law by its terms authorized Argentina to *expropriate* only 51% of YPF held by Repsol, but nothing in the law precluded Argentina from acquiring additional shares beyond the expropriated 51% through other means.

Argentina's sole support for its supposed "no more than 51%" requirement (at 39) is a prefatory provision of the Expropriation Law stating that Argentina's hydrocarbon policy includes "[i]ntegrat[ing] public and private capital." A447

51

(Expropriation Law § 3(c)).  But there is no inconsistency between that general objective and the tender-offer provision, which would not necessarily have resulted in Argentina acquiring 100% of YPF's shares.[17]  Indeed, the reference to "private capital," read in the context of § 15 of the law, confirms that the Expropriation Law mandates continued respect for YPF's existing corporate governance structure, including the bylaws.

*Third*, Argentina argues (at 36-37) that expropriation by way of tender offer would result in a price calculation inconsistent with the procedure mandated by the Expropriation Law.  But there is no inconsistency between the provisions, because the Expropriation Law and the bylaws address two different sets of shares:  the price calculation provided in the bylaws would apply only to any shares purchased through a tender offer *and not* to the 51% stake expropriated from Repsol.  Also, it bears emphasizing that Argentina's argument here is an effort to avoid paying *any* price for Plaintiffs' shares, once again simply flouting its obligations to international investors, as it has so many times in the past.  *See NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 251 (2d Cir. 2012); *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 237 (2d Cir. 2013)*.

---

[17] When Repsol and Petersen conducted their tender offers, only a small fraction of holders chose to tender their shares.

52

In a last-ditch argument, Argentina contends (at 37-38) that this Court must defer to the opinions of its experts and conclude that the Executive Decree and the Expropriation Law "have the legal effect of invalidating the bylaws as a matter of Argentine law." But in reality Argentina's experts did *not* opine that the Expropriation Law displaced the bylaws' tender-offer provision. Rather, Argentina's expert, Dr. Israel Mata, merely expressed the general opinion that a government act prevails over inconsistent "private corporate agreement[s]." A218 (Declaration of Ismael Mata ("Mata Decl.") ¶ 58); *see also*, *e.g.*, *id.* (*id.* ¶ 62) ("Clauses related to the Public Offer of Shares included in the YPF Bylaws cannot validly restrict, limit, or in any way affect the exercise of sovereign powers of the National Government in general and regarding expropriations in particular."). As explained above, however, in this case there is no conflict between the bylaws, on the one hand, and the Executive Decree and Expropriation Law on the other.

*In re Vitamin C Antitrust Litigation*, 837 F.3d 175 (2d Cir. 2016), is thus wholly inapt. There, this Court held that "a foreign government's official representation to the court regarding its laws or regulations" is entitled to some – but not absolute – deference in federal court. *Id.* at 189; *see Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir. 1998) (federal courts review questions of foreign law *de novo*). That deference was appropriate, this Court held, where the Chinese government made an official representation, submitted via *amicus* brief filed by the

53

Ministry of Commerce of the People's Republic of China, "the highest authority within the Chinese Government authorized to regulate foreign trade," directly addressing a dispositive question of Chinese law. *Vitamin C*, 837 F.3d at 180.

But *Vitamin C* also reaffirmed that "courts must still evaluate the relevant source material within the context of each case." *Id.* at 187. Here, the absence of any conflict between the Expropriation Law and the bylaws is sufficiently clear from the face of the two documents that the district court could not have credited a contrary interpretation, no matter its source. In fact, even the opinions of Argentina's paid experts, who lack any official imprimatur,[18] do not establish the existence of any conflict between the Expropriation Law and the bylaws. They merely opine that, at a general level, contracts cannot supersede Argentine public law. The district court ably discharged its responsibility under *Vitamin C*, in correctly determining that nothing in the Expropriation Law supersedes the bylaws' tender-offer requirement.

Finally, and in any event, Argentina's erroneous reading of the Expropriation Law, like its erroneous reading of the bylaws, is irrelevant to the FSIA issue. The *reason* why Defendants breached the commercial tender-offer provision is not the

---

[18] *Compare* Argentina Br. 37-38 *with D'Angelo v. Petroleos Mexicanos*, 422 F. Supp. 1280, 1283, 1285 (D. Del. 1976) (formal legal interpretation rendered by Mexico's attorney general), *aff'd*, 564 F.2d 89 (3d Cir. 1977); *Delgado v. Shell Oil Co.*, 890 F. Supp. 1324, 1363 (S.D. Tex. 1995) (formal legal opinion by Attorney General of the Philippines), *aff'd*, 231 F.3d 165 (5th Cir. 2000).

test under the FSIA, which provides that the applicability of the commercial-activities exception is judged by the *nature* of the conduct – here, the failure to make a tender offer pursuant to a commercial contract – not by its purpose. *See* 28 U.S.C. § 1603(d); *Weltover*, 504 U.S. at 614; *Janini*, 43 F.3d at 1537. Thus, even if, contrary to reality, Defendants breached the bylaws' tender-offer requirement because of public policy considerations embodied in the Expropriation Law, that would not alter the commercial nature of the tender-offer obligation itself, which is what Plaintiffs' claim seeks to enforce.

### D. YPF's Separate FSIA Argument Is Meritless

In its separate brief, YPF argues (at 14-24) that the gravamen of Petersen's claims against *YPF* is necessarily a challenge to sovereign rather than commercial conduct. As an initial matter, that argument strains credulity. Although it became a state instrumentality by virtue of Argentina's ownership of a majority of its shares, *see* 28 U.S.C. § 1603(b)(2), YPF was, and still is, a corporation, engaged in commercial activity. The Expropriation Law provided that YPF would "continue to operate as a publicly traded corporation[ ]" governed by its bylaws. A450 (Expropriation Law § 15); *see also* A216 (Mata Decl. ¶ 48) ("after the Government exercised its public powers of intervention . . . and expropriation of shares, YPF continued operating as a commercial company subjected to private law"). In short, YPF had no sovereign powers. Thus, unlike Argentina, YPF could *only* act "in the

manner of a private player within the market," "as distinct from those powers peculiar to sovereigns." *Nelson*, 507 U.S. at 360. All of YPF's activities are therefore "commercial" within the meaning of the FSIA. Certainly, it would make no sense for *YPF* to be protected by sovereign immunity where Argentina's own conduct is clearly commercial and subject to jurisdiction under the FSIA.

YPF nonetheless argues (at 16-17) that, by seeking to enforce the bylaws against YPF, Petersen must necessarily be arguing that YPF should (or could) have stopped Argentina from attaining control of the Company in violation of § 7(h) of the bylaws. That argument has no relevance to – indeed, it ignores – the first of Petersen's two separate claims against YPF. As the district court correctly recognized, Petersen's principal claim is that YPF is directly liable for the failure to tender. *See* SPA42-43 (Op. 42-43) (describing Petersen's claims). In a ruling not subject to appeal here, the district court rejected YPF's challenge to the merits of that claim under Federal Rule of Civil Procedure 12(b)(6). *See* SPA43 (Op. 43) ("Sections 7 and 28 of the Bylaws plausibly can be read to impose liability on YPF when shares are acquired in the triggering amount absent a tender offer.").

YPF makes no argument that Petersen's primary claim is barred by sovereign immunity. Nor could any such argument – which is now waived[19] – be

---

[19] *See*, *e.g.*, *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 625 n.1 (2d Cir. 2007) (argument raised for first time in reply brief on appeal is waived).

successful. To prove liability under its principal theory, Petersen need not demonstrate any fault on YPF's part, or show that YPF failed to stop Argentina from taking control of the Company. Rather, the gravamen of Petersen's principal contract claim against YPF is exactly the same as its claim against Argentina: it seeks damages for YPF's failure to comply with or enforce the tender-offer requirement of the bylaws. That contractual breach of a commercial obligation is – as discussed above – quintessential commercial conduct that falls squarely within the FSIA's commercial-activities exception. Indeed, the ability to hold YPF liable constituted a critical guarantee to private investors concerned about the ability to recover against Argentina. *See* A37 (Compl. ¶ 71).

YPF's argument that Petersen's alternative claim for breach of § 7(h) implicates sovereign immunity is also unpersuasive. Section 7(h) provides that any shares acquired in breach of the tender-offer requirement "shall not grant any right to vote or collect dividends or other distributions that the Corporation may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of the Corporation." A415. That contractual obligation is not uniquely sovereign; it relates to governance of a for-profit corporation. Indeed, YPF's obligations under § 7(h) would apply no differently if a *private shareholder* had acquired a controlling interest without making a tender offer. Under either scenario, the conduct at issue is commercial in nature.

57

Moreover, enforcing § 7(h) does not, contrary to YPF's contention (at 21), run contrary to the Expropriation Law. The provisions of the law YPF cites show only that Argentina was granted whatever rights were actually associated with the shares subject to expropriation, consistent with the bylaws. *See* A449 (Expropriation Law § 9) (Argentina shall exercise "all the political rights associated with the shares subject to expropriation") (cited at YPF Br. 19); A450 (Expropriation Law § 13) (Argentina shall exercise "all of the rights conferred upon the shares") (cited by YPF Br. 20). As the district court correctly held, the law did not even mention the bylaws, much less purport to override them. *See* SPA23 (Op. 23) ("[The Expropriation Law] placed Argentina in the position of Repsol with respect to the shares subject to expropriation, leaving commercial rights and obligations intact, including Bylaw § 7(h), which prohibited exercise of certain rights associated with shares acquired in breach of the tender offer requirement."). There is no "absurdity" in that result; it is exactly what Argentina promised the international investment community when it took YPF public.

The "temporary occupation authority" on which YPF relies (at 20) also does not conflict with § 7(h). It provided for the temporary transfer of the rights to the Repsol shares, but only as a stopgap measure and only to the extent consistent with the bylaws. *See supra* p. 17; A508 (Bianchi Decl. ¶ 66) ("[T]he obligation to carry out a [tender offer] *and all related obligations* are not incompatible with either an

expropriation or a temporary taking."); A509 (*id.* ¶ 74) ("Once Argentina seized control of YPF, it . . . was obligated to operate YPF in compliance with its bylaws.").

Finally, even indulging YPF's erroneous premise that the intervention and Expropriation Laws conflict with § 7(h), that would not convert YPF's breach into a sovereign act. For example, in *Weltover*, Argentina's breach of the bond contracts in issue was the result of "a Presidential Decree." 504 U.S. at 610. Still, the Court held, the lawsuit fell within the commercial-activities exception because the "*issuance*" of, and thus the State's liability under, a bond contract was commercial, and not sovereign. *Id.* at 615-16 (emphasis added). So too here: YPF's failure to abide by its own corporate governance rules remains quintessentially commercial in nature even if the *purpose* of the breach was to comply with the wishes of its majority shareholder. *See* 28 U.S.C. § 1603(d). Indeed, the bylaws provisions constitute a commercial guarantee to YPF's shareholders in the event Argentina decided to reassert control, whether through sovereign acts or commercial acquisitions. *Cf. Winstar*, 518 U.S. at 868-71 (plurality) (recognizing that the government can enter into commercial obligations that insure against losses from sovereign conduct). Thus, even assuming the Expropriation Law had directed YPF not to comply with § 7(h), which it did not, that would not insulate it from liability for failing to fulfill its commercial bargain. *See Janini*, 43 F.3d at 1537 ("That the

termination [of plaintiffs' employment contract] may have been accomplished by a formal decree of abrogation does not affect its commercial nature.").  Both the Company and the offending shareholder are liable under the bylaws for breaches of § 7(h), and YPF cannot shield itself with sovereign immunity simply because the offending shareholder in this case happens to be Argentina.

## II.  THE U.S. NEXUS REQUIREMENT OF THE COMMERCIAL-ACTIVITIES EXCEPTION IS SATISFIED

### A.  Defendants' Commercial Conduct Caused Direct Effects in the United States

The FSIA creates jurisdiction over a foreign state's commercial activities outside the United States if they had a "direct effect in the United States."  28 U.S.C. § 1605(a)(2).  As the district court correctly held, and neither appellant disputes, the breach of the tender-offer requirement clearly had a direct effect in the United States.  "[I]n contract cases, a breach of a contractual duty causes a direct effect in the United States sufficient to confer FSIA jurisdiction so long as the United States is the place of performance for the breached duty."  *Atlantica Holdings*, 813 F.3d at 108-09; *see Weltover*, 504 U.S. at 619.  Here, the NYSE-listed YPF shares were held as ADRs in New York.  The tender offer thus necessarily required performance – and payment of funds – into the United States.

*See supra* pp. 11-12.[20]  And the failure to do so affected not only Petersen, but also Eton Park, a New York-based investor.  *See Atlantica Holdings*, 813 F.3d at 111 (holding that FSIA plaintiffs need not demonstrate a direct effect "*on themselves*" but rather need only show "a direct effect *in* the United States," including an effect "on non-party United States investors").

Although YPF does not deny that the failure to tender had direct effects, it argues (at 24-25) that allowing Argentina to vote its shares in violation of § 7(h) had no "immediate" effects in the United States.  As explained above, however, that argument ignores Petersen's principal claim – upheld by the district court – that YPF is directly liable under the bylaws for the failure to tender.  In any event, contrary to YPF's conclusory argument, the failure to tender was a direct consequence – not merely an "incidental" effect – of YPF's failure to enforce the bylaws.  Thus, under either of Petersen's claims, YPF's conduct had the requisite nexus to the United States.

---

[20] Petersen's own tender offer, which it duly completed when its ownership stake crossed the 15% threshold, provides a ready example.  *See* Ex. 99.A.1 to TO Statement at ii (Sept. 11, 2008), *available at* https://www.sec.gov/Archives/edgar/data/904851/000095012308010918/y71140exv99waw1waw1.htm.  Petersen "published announcements of" the tender offer "in Argentine and New York newspapers, respectively, pursuant to the By-laws." *Id.* at 26.  And it made a separate "U.S. offer" filed with the SEC.  *Id.* at iii.  With respect to that U.S. offer, Petersen informed holders of ADRs (which trade on the NYSE) that payment for accepted offers "will be made by deposit of the Offer Price therefor in U.S. dollars with the U.S. Receiving Agent," who would then "act as agent for tendering holders . . . and transmit[] payments to such tendering holders," including any investors in the United States.  *Id.* at 5.

61

**B.    Defendants' Conduct Also Had Substantial Contact with the United States**

While this Court can affirm based solely on the commercial-activities exception's third clause, the first clause provides an additional basis for jurisdiction.  *See Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82, 88 (2d Cir. 2002) (court of appeals may affirm on any ground supported by record).  The first clause applies to lawsuits based upon "commercial activity carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(2).  The FSIA defines "commercial activity carried on in the United States by a foreign state" to mean "commercial activity carried on by such state and having substantial contact with the United States."  *Id.* § 1603(e).  And, as noted, commercial activity refers *either* to a specific act – such as breach of contract – or to "a regular course of commercial conduct."  *Id.* § 1603(d).

Petersen's suit is based upon conduct by Argentina and YPF with the requisite "substantial contact."  As discussed above, both contract formation and contract breach are part of the gravamen of Plaintiffs' claim.  Here, the formation of the bylaws was directly and substantially connected to the United States because it arose from Defendants' solicitation of private capital from U.S. investors in U.S. markets.  *See Gemini Shipping, Inc. v. Foreign Trade Org. for Chems. & Foodstuffs*, 647 F.2d 317, 319 (2d Cir. 1981) (substantial contact where contract originated when "Syria solicited bids in the United States"); *Atlantica Holdings,*

62

*Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 558-59

(S.D.N.Y. 2014) (jurisdiction where defendant "sent its agents to the United States

to meet with investors as part of the course of the fraudulent activity alleged,"

"sent copies of the Information Memorandum to all Euronote holders in the United

States," and "induced investment by [American parties]"), *aff'd on other grounds*,

813 F.3d 98 (2d Cir.), *cert. denied*, 137 S. Ct. 493 (2016); *Daventree*, 349 F. Supp.

2d at 751 ("solicitation of prospective buyers [of financial instruments] . . . in the

United States" established requisite connection).  As a result of the commitments it

made in the bylaws, which Argentina and YPF disseminated widely to U.S.

investors, Argentina was able to secure more than $1.1 billion in investment from

just the U.S. portion of YPF's IPO.  *See* A19 (Compl. ¶ 13) (65 million of the

IPO's 140 million shares were sold in the United States).

  The fact that the contractual obligation at issue – the tender offer – was to

have been performed in the United States further connects Defendants' conduct to

the United States.  "Where, as here, the commercial activity in question centers on

the formation of a contract, the United States will be found to have had a

substantial contact with that activity . . . if substantial aspects of the contract were

to be performed here."  *Gibbons v. Udaras na Gaeltachta*, 549 F. Supp. 1094,

1113 (S.D.N.Y. 1982); *see American Constr. Mach. & Equip. Corp. v. Mechanised

Constr. of Pakistan Ltd.*, No. 85 Civ. 3765 (JFK), 1986 WL 2973, at *3 (S.D.N.Y.

Mar. 5, 1986) ("where the actual commercial activity consisted of negotiation and ultimate formation of a contract in the United States, some part of which contract was to be performed in the United States, the first clause of § 1605(a)(2) applie[s]").[21]

Here, the bylaws explicitly contemplated New York as a place of performance for the tender offer. First, Argentina was required to publish notice of the tender offer in major newspapers in New York. *See* A411-12 (Bylaws § 7(f)(iv)); A31 (Compl. ¶ 44). Second, Argentina had to follow "regulations in the jurisdictions where the takeover bid takes place and the provisions of the stock exchanges where [YPF's] shares and securities are listed." A410 (Bylaws § 7(f)). Third, Argentina had to transmit the tender offer to YPF, *see id.* (*id.* § 7(f)(i)), which would then have transmitted the offer to the record owners of YPF stock, *see* A411 (*id.* § 7(f)(iii)), including major U.S.-based investors like Eton Park.

Argentina urges (at 43) that its decision not to perform cannot be an "act in the United States." But the first clause's "substantial contact" test does not focus, as Argentina does, on the act of non-performance taken in isolation. Notably, the two cases Argentina cites do not arise under the first clause, and therefore do not

_____

[21] Contrary to Argentina's argument below (A586 (Hr'g Tr. 56:15-19)), *Shapiro v. Republic of Bolivia*, 930 F.2d 1013 (2d Cir. 1991), did not abrogate *Gibbons*. *Shapiro* observed that § 1603's "substantial contact" test requires more than "minimum contacts" required for personal jurisdiction, but *Gibbons* did not equate the two, and *Shapiro* did not so much as mention *Gibbons*.

address § 1603(e)'s test. *See Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131, 132 (2d Cir. 2012) (applying the *second* clause of the commercial-activities exception); *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 71 (2d Cir. 2010) (third clause). Argentina's and YPF's formation and breach of a contract requiring the performance of numerous acts in New York establishes the necessary "substantial contact" with the United States, and that is all that is required. The court below thus had jurisdiction under both the first and third clauses of § 1605(a)(2).

## III. THE ACT OF STATE DOCTRINE IS NOT PROPERLY BEFORE THE COURT AND, IN ANY EVENT, DOES NOT APPLY HERE

### A. The Act of State Defense Is Inapplicable Because Plaintiffs Do Not Challenge the Legality of the Expropriation Law

This Court has not accepted appellate jurisdiction of Defendants' appeals of the district court's act of state ruling, and it need not do so. The act of state doctrine is not jurisdictional; rather, the doctrine provides an affirmative *merits* defense that Defendants bear the burden to prove. The issue thus does not present the kind of pure legal question that normally constitutes a "controlling question of law." 28 U.S.C. § 1292(b).

If it reaches the issue, this Court should affirm the district court's correct conclusion that the act of state doctrine does not bar this suit "for the same

fundamental reason" (Argentina Br. 45) the FSIA does not: Petersen's suit does
not challenge the validity of Argentina's Expropriation Law.

     **1.**     The act of state doctrine provides that, in deciding cases in federal
court, "the acts of foreign sovereigns taken within their own jurisdictions shall be
deemed valid." *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*,
493 U.S. 400, 409-10 (1990). Thus, "the factual predicate for application of the act
of state doctrine does not exist" where "[n]othing in the present suit requires the
Court to declare invalid . . . the official act of a foreign sovereign." *Id.* at 405.
Likewise, the doctrine reaches only foreign acts committed inside the foreign
sovereign's borders. *See Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004)
(doctrine requires courts not to question the validity of public acts by foreign
sovereigns "within their own borders").

     Because Defendants bear the burden of proving that the act of state doctrine
applies, dismissal is warranted under Rule 12(b)(6) only if the doctrine's
applicability is "shown on the face of the complaint." *Konowaloff v. Metropolitan
Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012); *accord Daventree*, 349 F. Supp.
2d at 755 ("As a substantive rather than a jurisdictional defense, the Act of State
doctrine is more appropriately raised in a motion for summary judgment than in a
motion to dismiss."). Defendants cannot carry their burden here because
Petersen's complaint makes clear that it does not challenge Argentina's

expropriation of Repsol's shares.  Quite the contrary, Petersen's allegation that

Argentina and YPF breached the bylaws by failing to engage in a tender offer will

not at any stage of the case require a court to pass judgment on the validity of the

Executive Decree or the Expropriation Law, as the district court correctly

recognized.  *See* SPA22-24 (Op. 22-24).

The district court also observed that a Supreme Court plurality has

concluded that the act of state doctrine does not apply to "purely commercial

conduct."  SPA21 (Op. 21).  But it did not rest on any bright-line "commercial"

exception in finding the doctrine not to apply here.  Rather, recognizing that the

gravamen of Petersen's claim challenges Defendants' commercial conduct, the

court held that "the outcome of this case does not turn on the validity of

Argentina's official acts."  SPA22 (Op. 22); *accord id.* ("Defendants have not

shown that performance of the alleged [contractual] obligations would constitute a

violation of Argentine law.").  Likewise, this Court need not address Argentina's

argument (at 46-48) because the existence of a commercial-activities exception is

not necessary to resolve the act of state issue in this case.

**2.**     Argentina's act of state argument (at 48-49) rests on the same

erroneous interpretations of the bylaws and the Expropriation Law as its FSIA

arguments.  As explained above (at 41-46), the district court correctly held that the

bylaws do not require that the tender offer occur before Argentina could acquire a

controlling stake in YPF. Moreover, the tender-offer requirement is not incompatible with the Expropriation Law, which does not preclude Argentina from acquiring additional shares beyond Repsol's 51% stake. *See supra* pp. 51-52.

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002), cited by Argentina (at 49), is inapposite. There, the plaintiff alleged that an expropriation *itself* constituted a breach of contract; the complaint expressly alleged that Kazakhstan, by expropriating the plaintiff's property, was "converting [the property in question] for [its] own use." 296 F.3d at 1166 (first alteration added). It was thus plain from the complaint that resolving the plaintiff's claim would require the court to "examine the validity" of the expropriation, *id.*, whereas, here, the validity of the expropriation of Repsol's shares is not in question.[22]

**3.**   YPF's act of state argument fails for the same reasons. As explained above, Petersen's claims against YPF do not seek to challenge or invalidate the Expropriation Law. Petersen's principal claim, which YPF again ignores, seeks to enforce the bylaws' tender-offer provision, which is binding on YPF in addition to Argentina. That claim involves no challenge to the Expropriation Law. Moreover, Plaintiffs' alternative claim that YPF violated § 7(h) of the bylaws also does not ask the federal courts "to disregard the Expropriation Law's priority over bylaw § 7(h)," YPF Br. 29, because that law did not abrogate the bylaws, including

---

[22] For the same reasons, Petersen's claims for anticipatory breach and breach of the duty of good faith are not barred by the act of state doctrine.

68

§ 7(h), as the district court correctly held.  SPA23 (Op. 23); *see supra* p. 58.  And, even if the Expropriation Law were inconsistent with § 7(h), that would not make Petersen's claim for breach of § 7(h) a challenge to the Expropriation Law.  YPF entered into a commercial contract designed to insure investors like Petersen against the economic consequences of a takeover by Argentina.  The act of state doctrine does not apply because the courts can presume the validity of the takeover while still enforcing the commercial promises that flow from it.  *See supra* pp. 59-60.

YPF's contrary argument (at 30) relies primarily on *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449 (2d Cir. 1987) – but that case is inapplicable here, and its vitality is also in serious doubt.  The lawsuit in *O.N.E.* was "a direct challenge" to Colombia's shipping laws, which had compelled the defendants' allegedly anticompetitive conduct.  *Id.* at 451; *see id.* at 452-54.  That conduct was unlawful *only if* the shipping laws were, too.  Here, in contrast, Plaintiffs' lawsuit seeks to enforce Defendants' contractual guarantee of compensation if Argentina used its sovereign powers (or any other means) to renationalize YPF.  Enforcing that contract would not invalidate the Expropriation Law.  It would give effect to Defendants' commercial promises to YPF's shareholders.

Moreover, since *O.N.E.*, the Supreme Court has explained that the act of state doctrine is not, as this Court had suggested, a broad-based "doctrine of abstention."  *W.S. Kirkpatrick*, 493 U.S. at 406.  Rather, it is a narrow "*principle of*

69

*decision*" that "merely requires that . . . the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *Id.* at 406, 409; *see In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 547-48 (E.D.N.Y. 2011) ("I believe that [*O.N.E.*] ha[s] been overruled by *W.S. Kirkpatrick*.").[23]  This lawsuit is wholly consonant with that rule.  It does not challenge the validity of any sovereign act of Argentina.  It does not request injunctive relief or seek to unwind anything that Argentina has done.  It simply seeks to enforce commercial obligations that YPF voluntarily undertook in soliciting and obtaining billions of dollars in private investment from investors in the United States and across the globe.

## B.    Argentina's Acts Were Not Carried out Solely in Argentina

The act of state doctrine is also inapplicable because Argentina's acts were not carried out solely "within its own territory." *W.S. Kirkpatrick*, 493 U.S. at 405.  Here, Argentina breached bylaws requiring performance of obligations on U.S. soil, that affected U.S. shareholders (such as Eton Park) and holders of ADRs held in New York (such as Petersen), and that harmed creditors of Petersen that conduct extensive business in New York.  *See supra* pp. 13-14, 60-61, 64.  By failing to abide by obligations that had widespread predictable effects in the United States, Argentina "involve[d] itself within our nation's jurisdiction," rendering the act of

---

[23] *McElderry v. Cathay Pacific Airways, Ltd.*, 678 F. Supp. 1071 (S.D.N.Y. 1988), and *Shen v. Japan Airlines*, 918 F. Supp. 686 (S.D.N.Y.), *aff'd*, 43 F.3d 1459 (2d Cir. 1994) – cited by YPF (at 30) – likewise are factually inapposite, in addition to relying on *O.N.E.*'s outdated conception of the act of state doctrine.

state doctrine inapplicable. *Bandes v. Harlow & Jones, Inc.*, 852 F.2d 661, 666 (2d Cir. 1988); *see Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 521-22 (2d Cir. 1985) (act of state doctrine inapplicable where Costa Rica extinguished right to repayment in United States); *In re Grand Jury Subpoena dated August 9, 2000*, 218 F. Supp. 2d 544, 556 (S.D.N.Y. 2002) (act of state doctrine inapplicable because "the intended effect [of the foreign acts] is here in New York"); *Lightwater Corp. v. Republic of Argentina*, Nos. 02 Civ. 3804 (TPG) et al., 2003 WL 1878420, at *5 (S.D.N.Y. Apr. 14, 2003) ("An act of a nation in failing to make payments on bonds held in other countries does not constitute an act of state dealing with property located within the nation."). The judgment below can be affirmed on this ground as well.

## CONCLUSION

The Court should affirm the district court's judgment denying Defendants' motions to dismiss based on foreign sovereign immunity. Should the Court accept jurisdiction over the act of state issue, it should affirm on that issue as well.

Respectfully submitted,

/s/ *Mark C. Hansen*

REGINALD R. SMITH
KING & SPALDING
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
(713) 751-3200
(713) 751-3290 (fax)

MICHAEL K. KELLOGG
MARK C. HANSEN
DEREK T. HO
BENJAMIN S. SOFTNESS
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

March 14, 2017
(202) 326-7999 (fax)

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies that this brief complies with the applicable type-volume limitations as modified by this Court's order of March 2, 2017. This brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 16,987 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Office Word 2013) used to prepare this brief.

 /s/ *Derek T. Ho*
Derek T. Ho

March 14, 2017

## CERTIFICATE OF SERVICE

I hereby certify that, on this 14th day of March 2017, I electronically filed the foregoing Brief of Plaintiffs-Appellees with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/ *Derek T. Ho*
Derek T. Ho